# AWARD

in the matter of the arbitration between

**Frontera Resources Azerbaijan Corporation**

Claimant and Respondent in Counterclaim

– and –

**State Oil Company of the Republic of Azerbaijan**

Respondent and Counterclaimant

**Counsel for Frontera Resources Azerbaijan Corporation**

Douglas Stinemetz, Esq.
Haynes & Boone LLP
1000 Louisiana St., Suite 4300, Houston, Texas, USA

**Counsel for State Oil Company of the Republic of Azerbaijan**

Ms Irene Dallas
Field Farm Barn, Sulhamstead Hill, Sulhamstead, Reading, United Kingdom

Arbitrators
Judge Bengt G. Nilsson
Mr Kaj Hobér
Mr Christer Thingwall

Rendered in Stockholm on 16 January 2006

# 1. BACKGROUND

## 1.1 The entities involved in the dispute

1. The State Oil Company of the Republic of Azerbaijan ("SOCAR") is a Government body of the Republic of Azerbaijan, having its principal place of business at Neftchilar Prospecti 73, Baku 370004, Republic of Azerbaijan.

2. Frontera Resources Azerbaijan Corporation ("Frontera") is a company incorporated in Cayman Islands with address c/o Maples and Calder, P.O. Box 309 GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.

3. Delta/Hess (K&K) Limited ("Delta/Hess"), a company incorporated in Cayman Islands.

4. SOCAR Oil Affiliate ("SOA"), a company fully owned and formed by SOCAR.

5. Frontera Caucasus Azerbaijan Corporation, parent company incorporated in Cayman Islands.

6. China National Oil and Gas Exploration and Development Corporation ("CNODC") and Fortunemate Assets Limited ("FAL"), two companies owned by Chinese interests.

## 1.2 The Production Sharing Agreement

1. The dispute between Frontera and SOCAR arises from an Agreement on the Rehabilitation, Exploration, Development and Production Sharing of certain oil resources in the Republic of Azerbaijan entered into by Frontera, SOCAR, Delta/Hess and SOA (the "PSA") in November 1998.

2. Under the PSA SOCAR granted to SOA, Frontera and Delta/Hess (the "Contractors") the sole and exclusive right to conduct petroleum operations within and with respect to a Contract Area, which included the Kursangi and Karabagli oil fields in the Republic of Azerbaijan, in accordance with the terms of the PSA and during the term thereof.

3. The Contractors created and owned Salyan Oil Comanpy Ltd. ("Salyan Oil") in accordance with the terms of the PSA. Salyan Oil was the operating company for the Contractors and was appointed operator for the Kusangi and Karabagli oil fields.

## 1.3  The Agreement to Arbitrate

The PSA contains in Article 26 and Appendix 6 the following arbitration clause:

### "SECTION 26.3: Arbitration

(a) Except for any matter to be referred to an expert pursuant to Articles 16.2 (a)(ii) and 16.2 (c), in the event of a dispute arising between SOCAR and any or all of the Contractor Parties (including matters which are not resolved at the Steering Committee), the disputing Parties shall meet in an attempt to resolve the dispute to their mutual satisfaction by reference to the terms of this Agreement. If satisfactory mutual agreement is not achieved within thirty (30) days after receipt by a Party of notice of such dispute, such dispute shall be settled in accordance with the Arbitration Procedure and the applicable law provisions of Article 26.1.

(b) Nothing in this Agreement shall limit the rights of the Contractor Parties pursuant to Articles 11 through 15 of the Law on Protection of Foreign Investment dated 15 January 1992, which rights shall apply in addition to any other rights Contractor may have under this Agreement notwithstanding any other law, both current and future, in the Azerbaijan Republic. If any of Contractor's rights, interests or property are expropriated, nationalized or otherwise taken by reason of any act or failure to act of any Governmental Authority, then the arbitrators shall apply the principle of indemnification (including prompt, full and effective compensation in Dollars) at the full market value, on the basis of an on-going concern utilizing the discounted cash flow method, assuming a willing buyer and seller in a non-hostile environment, and disregarding the unfavourable circumstances under which or following which Contractor shall be deprived of its rights, interest (including its interest in undeveloped reserves) or property. The arbitrators shall select an investment bank of good international reputation for purpose of appraising the full market value of said rights, interest (including its interest in undeveloped reserves) or property of Contractor.

(c) The rights and obligations under this Article 26.3 shall survive the termination of this Agreement.

## APPENDIX 6: ARBITRATION PROCEDURE

Except as otherwise provided in this Agreement, all disputes arising between SOCAR and any or all of the Contractor Parties, including without limitation, any dispute as to the validity, construction, enforceability or breach of this Agreement, which are not amicably resolved by the Parties in accordance with the provisions of Article 26.3(a) shall be finally settled by a sole arbitrator appointed by the unanimous decision of the Parties or, in the absence of such unanimous decision, by a panel of three (3) arbitrators, under the Arbitration Rules of The United Nations Commission on International Trade Law known as UNCITRAL (the "Rules") adopted on 15 December 1976 as amended by UNCITRAL from time to time. In the event the Rules fail to make provision for any matter or situation the arbitration tribunal shall establish its own rules to govern such matter and procedure and any such rules so adopted shall be considered as a part of the Rules. For purposes of allowing such arbitration, and enforcement and execution of any arbitration decision, award, issuance of any attachment, provisional remedy or other pre-award remedy, each Party waives any and all claims to immunity, including, but not limited to, any claims to sovereign immunity.

The arbitration shall be held in Stockholm, Sweden. The language used during the procedure shall be the English language and only the English language text of this Agreement will be utilized by the arbitrators.

After providing thirty (30) days prior written notice to the other Party of intent to arbitrate, either SOCAR or Contractor may initiate arbitration (the Party initiating arbitration shall hereinafter be called the "First Party") submitting a request for arbitration to the other Party, as provided in the rules, and the Secretary General of the Permanent Court of Arbitration in the Hague, and appointing an arbitrator who shall be identified in said request. Within thirty (30) days of receipt of a copy of the request the other Party to the dispute ("Second Party") shall respond, identifying the arbitrator that it has selected. If the Second Party does not so appoint its arbitrator, the Secretary General of the Permanent Court of Arbitration in the Hague shall appoint a second arbitrator in accordance with the Rules. The two arbitrators shall, within thirty (30) days, select a third arbitrator failing which the third arbitrator shall be appointed by the Secretary General of the Permanent Court of Arbitration in the Hague, in accordance with the Rules. Unless otherwise agreed in writing by the Parties, the third arbitrator to be appointed shall not be a citizen of a country in which any Party (including the Ultimate Parent Company of such Party) is incorporated.

The Parties shall extend to the arbitration tribunal all facilities (including access to the Petroleum Operations and facilities) for obtaining any information required for the proper determination of the dispute. Any Party shall be allowed only one absence or default beyond its reasonable control which prevents or hinders the arbitration proceeding in any or all of its stages. Additional absences, or absences which are within a Party's reasonable control, shall not be allowed to prevent or hinder the arbitration proceeding.

Without limiting the generality of their powers, the arbitrators shall have the power to award costs and damages as necessary with respect to the Government Guarantee and with respect to Article 26.2.

The arbitration tribunal's award shall be final and binding on the Parties and shall be immediately enforceable. Judgment on the award rendered may be entered and execution had in any court having jurisdiction or application may be made to such court for a judicial acceptance of the award and an order of enforcement and execution, as applicable.

Each Party shall pay the costs of its own arbitrator and the costs of the third arbitrator in equal shares, and any costs imposed by the Rules shall be shared equally by the Parties. Notwithstanding the above, the arbitrators may, however, award costs (including reasonable legal fees) to the prevailing Party from the losing Party. In the event that monetary damages are awarded, the award shall include interest from the date of the breach or other violation to the date when the award is paid in full. The rate of interest shall be LIBOR plus four (4) percent over the period from the date of the breach or other violation to the date the award is paid in full. Each Party waives any and all requirements of any national law relating to notice of a demand for interest or damage for the loss of the use of funds."

## 1.4   The applicable law

The PSA further contains in Article 26 the following provision on governing law:

### "SECTION 26.1: Applicable Law

This Agreement shall be governed and interpreted in accordance with principles of law common to the law of the Azerbaijan Republic and English law, and to the extent that no common principles exist in relation to any matter then in accordance with the principles of the common law of Alberta, Canada (except for laws regarding conflicts of laws). This Agreement shall also be subject to the international legal principle of *pacta sunt servanda* (agreements must be observed). Upon approval by the Parliament of the Azerbaijan Republic of this Agreement, this Agreement shall constitute a law of the Azerbaijan Republic and shall take precedence over any other current or future law, decree or administrative order (or part thereof) of the Azerbaijan Republic which is inconsistent with or conflicts with this Agreement except as specifically otherwise provide in this Agreement."

## 1.5 The provisions in the PSA regarding deliveries of oil to the local market and import and export of oil

**"ARTICLE 14**

**LOCAL MARKET OIL**

14.1  <u>Contractor's Obligation for Sale of Local Market Oil</u>

(a) Contractor shall have the obligation to sell annually to SOCAR an amount of Crude Oil, for purposes of this Agreement defined as "Local Market Oil", under the Local market Oil Programme on a quarterly schedule agreed between the Parties calculated in accordance with the procedure below:

$$LMO(n) = LMO(n-1) \times (1 - ADR)$$

Where:

LMO(n)  means the amount of Local Market Oil to be delivered by Contractor to SOCAR in the "$n$"th Calendar Year;

LMO(n – 1)  means the amount of Local Market Oil delivered by Contractor to SOCAR in the "$n$th – 1" Calendar Year. For the first year following the Effective Date LMO(n – 1) is determined as total amount of Crude Oil lifted from the Contract Rehabilitation Area in the year preceding the Effective Date;

ADR  means the average decline rate of Crude Oil production for the period from 1992 to 1997.

ADR is determined according to the following formula:

$$ADR = \frac{(1-Q_{93}/Q_{92})+(1-Q_{94}/Q_{93})+(1-Q_{95}/Q_{94})+(1-Q_{96}/Q_{95})+(1-Q_{97}/Q_{96})}{5}$$

where:

Q92, Q93, Q94, Q95, Q96, Q97 – annual production of Crude Oil from the Kursangi and Karabagli fields respectively, for 1992, 1993, 1994, 1995, 1996, 1997.

(b) Each of the Contractor Parties shall quarterly sell to SOCAR at the Delivery Point a portion of Local Market Oil in proportion to the total amount of Crude Oil received by such Contractor Party at the Delivery Point in a current Calendar Quarter.

(c) SOCAR shall pay to each Contractor Party the value of Local Market Oil sold in agreed currency and at the price of Crude Oil established by the Governmental Authorities of the Azerbaijan Republic for local market.

14.2    Underlift of Local Market Oil

(a)    In the event of failure by Contractor of its obligations set forth in Article 14.1 ("Shortfall") during the Calendar Quarter according to the schedule agreed by the Parties which constitutes a Material Breach by Contractor of its obligations, the Shortfall shall be paid back by Contractor in full with Crude Oil of similar quality or any other quality agreed by SOCAR in the next month following such Calendar Quarter.

(b)    In the event of Shortfall within two (2) consecutive Calendar Quarters and failure by Contractor to pay back the Shortfall, SOCAR shall have the right to terminate this Agreement with respect to the Contract Rehabilitation Area in accordance with the procedure and terms set out in Article 32.1 (a).

14.3    Notwithstanding any other provision of Article 14, SOCAR shall be entitled at its sole discretion to suspend the purchase of Local Market Oil. In such case, SOCAR shall notify Contractor in writing within ninety (90) days before the Calendar Quarter in which SOCAR desires to suspend the purchase of Local Market Oil. If SOCAR elects to resume the purchase of Local Market Oil thereafter, SOCAR shall notify Contractor in writing within ninety (90) days before the Calendar Quarter in which SOCAR desires to resume the purchase of Local Market Oil.

14.4    If any amount payable by SOCAR pursuant to Article 14.1 (c) remains unpaid for two (2) consecutive Calendar Quarters, then Contractor shall be entitled to cease sales of Local Market Oil to SOCAR pursuant to Article 14.1 (b). Upon SOCAR paying the outstanding amount, Contractor shall not more than ninety (90) days thereafter resume sales of Local Market Oil to SOCAR under the Local Market Oil Programme.

## ARTICLE 21
## IMPORT AND EXPORT

21.2    Petroleum Export

Each Contractor Party, its customers and its and their carriers shall have the right to freely export, free of all Taxes (except for Profit Tax) and at any time, Petroleum to which such Contractor Party is entitled in accordance with the provisions of this Agreement.

21.3    Customs Laws

Subject to Articles 15, 21.1 and 21.2, all imports and exports carried out in connection with this Agreement shall be subject to the procedures and documentation required by applicable customs laws and regulations, and each Contractor Party, its Affiliates, its agents, the Operating Company and Sub-contractors shall pay any customs

service/documentation fees to the extent they are nominal and consistent with the actual costs of providing such customs service/documentation and are of a non-discriminatory nature, but in no event shall the service/documentation fees exceed the following:

| Declared Value of Shipment in Dollars | Duty |
| --- | --- |
| 0–100,000 | 0.15% of value |
| 100,000.01–1,000,000.00 | $150.00 plus 0.10% of value over $100,000.00 |
| 1,000,000.01–5,000,000.00 | $1,050.00 plus 0.07% of value over $1,000,000.00 |
| 5,000,000.01–10,000,000.00 | $3,850.00 plus 0.05% of value over $5,000,000.00 |
| more than 10,000,000.01 | $6,350.00 plus 0.01% of value over $10,000,000.00 |

21.4    Foreign Trade Regulations

Each Contractor Party, its Affiliates, its agents, the Operating Company and its Sub-contractors shall also be exempt from the provisions of Azerbaijan Republic foreign trade regulations concerning the prohibition, limitation and restriction of import and export and country of origin of those items indicated in Article 21.1 [which deals with equipment etc necessary for the petroleum operations; Tribunal's remark] and with respect to the Petroleum allocated to Contractor pursuant to this Agreement.

21.5    SOCAR Assistance

SOCAR shall, within the full limits of its authority, use all reasonable lawful endeavours, when requested to do so by Contractor, to ensure that the above mentioned exemptions are applied and expedite the movement through customs of any equipment or supplies of a Contractor Party, its Affiliates, its agents, the Operating Company and Sub-contractors and all of their employees and family members.

## ARTICLE 23
## INSURANCE, LIABILITIES AND INDEMNITIES

23.7    Consequential Losses

With respect to indirect or consequential loss arising out of or in connection with this Agreement or any activities thereunder, notwithstanding anything to the contrary elsewhere in the Agreement, without prejudice to the rights of the Contractor Parties under Articles 26.2 and 26.3 (b), the Parties shall not be liable whether in contract, tort or otherwise and regardless of any negligence under any circumstances whatsoever for any indirect or consequential loss. For the purposes of this Article 23.7 the expression "indirect or consequential loss" shall mean any indirect or consequential loss or damage including but not limited to inability to produce Petroleum, loss of or delay in production of Petroleum or loss of profits."

Apart from the PSA, mainly the following documents are of interest:

– A letter dated 10 February 2000 ("The February 2000 letter").

– A Security Assignment of a Production Sharing Contract signed by Frontera and the European Bank for Reconstruction and Development (the "Bank") on 14 November 2000 ("The Deed of Assignment" or "The Security Assignment").

– A Protocol between SOCAR, SOA, Frontera and Delta/Hess of 29 December 2000 ("The December 2000 Protocol").

– A Deed of Transfer, dated 4 July 2001, and signed by Frontera and the Bank ("The Deed of Transfer").

– A Deed of Release and Indemnity signed by the Frontera Companies, including Frontera, and the Bank on 21 April 2002 ("The Deed of Release").

– A Protocol signed by SOCAR, SOA, CNODC, FAL, Delta/Hess and the Bank on 4 July 2002 ("The July 2002 Protocol").

The PSA was subsequently approved by the Majlis (the Parliament of the Republic of Azerbaijan) and became part of the law of the Republic.


## 2.  SUMMARY OF THE PARTIES' CONTENTIONS

### 2.1  Frontera contends:

1. Frontera delivered in accordance with the terms of the PSA but SOCAR failed to pay for the oil. Frontera is entitled to payment for the quantity of LMO delivered but never paid for by SOCAR.

2. SOCAR's failure to pay for the oil delivered entitled Frontera to cease sales of LMO to SOCAR as provided in Article 14.4 of the PSA. SOCAR expressly consented to this fact. Frontera consequently attempted to export the quantities of oil intended for the Local Market.

3. In November 2000 the Azeri Customs Authorities, following instructions by SOCAR, stopped Frontera's shipments of oil destined for export, whereupon SOCAR seized the oil without paying for it. Frontera is entitled to payment at the world market price for the oil seized by SOCAR.

4.  As a result of SOCAR's actions, Frontera failed to make payments under the Loan Agreement between the borrower and the the Bank according to the terms under which the Bank had made available certain credit facilities. Thus, Frontera was forced to sign the Security Assignment according to which Frontera assigned all its rights, benefit, title and interest under the Project as security for the full payment of the obligations under the Loan Agreement.

5.  SOCAR never paid the outstanding amount for oil delivered and for the oil illegally taken. Thus, Frontera was not obliged to resume sales of LMO to SOCAR. However, subsequent to the execution of The December 2000 Protocol SOCAR took the shipments and paid for the oil at LMO price instead of the market price. Frontera is entitled to recover the price difference.

6.  SOCAR would be unjustly enriched if it were to be entitled to benefit from the July 2002 Protocol in respect of Frontera's claims. Thus, Frontera is in any case entitled to prevail on the basis of the principle of unjust enrichment.

7.  SOCAR's conduct constitutes an unlawful taking of oil under Article 26.3 (b) of the PSA. SOCAR abused its government authority to instruct the Customs Authorities to halt exports by the Contracting Parties and failed to reinstate the right of the Contractor Parties to export. Consequently, Frontera is entitled under Article 26.3 (b) to indemnification at full market value for taking of its oil.

## 2.2  SOCAR contends:

1.  Frontera did not deliver the required quantity of LMO at the end of 1999 and the beginning of 2000. Frontera did not comply with the provision in Article 14.2 (a) of the PSA dealing with the consequences in case of shortfall in deliveries. SOCAR also had other concerns about Frontera's fulfilment of its obligations under the PSA. This situation triggered a conflict between Frontera and SOCAR (the "LMO Dispute"). SOCAR then stopped Frontera's export and took a shipment of oil intended for export in an attempt to stop the flow of oil. The LMO Dispute was solved through the execution of the December 2000 Protocol, but this Protocol did not entitle Frontera to export

oil to the world market until Frontera's LMO obligations had been fulfilled. Frontera's claim for price differences is therefore unfounded.

2. SOCAR does not agree with Frontera's interpretation of Article 14.4 of the PSA. This article did not come into operation until July 2000.

3. SOCAR never consented to the fact that Frontera was entitled to cease sales of LMO as provided in Article 14.4 of the PSA. Mr Steve Nicandros, the President of Frontera, and SOCAR's President, Mr Natig Aliyev, made a gentlemen's agreement on 10 February 2000 when Mr Nicandros visited SOCAR's office in Baku. At this meeting Mr Aliyev agreed to waive SOCAR's LMO entitlement as of 1 April 2000. In any event the terms of the PSA did not entitle Frontera to take any action as of 10 February 2000. Mr Aliyev also stated that this agreement would assist SOCAR as they would not need to pay for the LMO, which had been delivered, since Frontera could recover funds from the additional revenue they would achieve by exporting.

4. The Deed of Release 2002 entitled the Bank to settle the LMO Dispute. The Bank finally settled the LMO Dispute through the July 2002 Protocol. As a result of the settlement contained in this Protocol SOCAR agreed not to make any claim related to the LMO Dispute.

5. Matters regarding unjust enrichment fall outside the terms of reference of the Tribunal in accordance with the arbitration agreement as set out in Article 26.3 (a) of the PSA. Non-contractual disputes, not arising out of the PSA, which are unrelated to the contractual rights of the Parties to the PSA, do not come within the terms of reference laid down in Article 26.3 (a).

6. The Tribunal has no mandate under neither the UNCITRAL Rules nor any relevant laws of Sweden to assume jurisdiction over Frontera's claims under Article 26.3 (b), which applies to claims by the Contractor, not the Contractor Parties. In any event Article 26.3 (b) of the PSA itself envisages the entire Project be expropriated, nationalized or taken by the government for a claim to arise, and in such circumstances the proper claimant is the Contractor, not Frontera as a Contractor Party.

7. The claim of Frontera that SOCAR caused the Bank to foreclose the loan (the "Bank claim") is also outside the terms of reference of the Tribunal. The

Bank claim amounts to consequential loss, which is not recoverable by any of the Contractor Parties or SOCAR as a matter of agreement according to Article 23.7 of the PSA.

Further, SOCAR submits that Frontera raised the claims for unjust enrichment and under Article 26.3 (b) of the PSA (items 6 and 7 above) only at the oral hearing and that it would be manifestly unfair by the Tribunal according to Article 20 of the UNCITRAL Rules to deal with these claims at such a late stage of the proceedings thereby depriving SOCAR of a right to reply to these new contentions.

## 2.3 In response to SOCAR's contentions Frontera asserts:

1. The December 2000 Protocol is inefficient and unenforceable (null and void).

2. Frontera's right to collect payment for LMO remained with Frontera and was not settled by the July 2002 Protocol. This follows from the Security Assignment. In March 2002 the Bank sold its participating interest in the PSA and the Security Assignment was terminated.

3. Frontera's claims for damages were never assigned to the Bank. The Bank and Frontera specifically recognized that Frontera continued to have claims against SOCAR. Moreover, a significant portion of Frontera's claims is not encompassed by the LMO Dispute.

4. The Security Assignment and the Deed of Release do not amend the PSA.

5. SOCAR is not a party to the Deed of Release.

6. Frontera is not a party to the July 2002 Protocol and is not bound by it.

7. Frontera took over the Project in mid-month and can therefore not be charged with oil requirements for the full month of November 1999.

8. Frontera has made up for the shortfall in deliveries of oil in December 1999.

9. Frontera did not exercise direct or exclusive control of Salyan Oil.

## 2.4  SOCAR responds:

1. The Bank did not conclude its involvement in the PSA already in March 2002. The transaction to reinstate Frontera in its rights under the PSA took place on 4 July 2002.

2. That SOCAR was not a party to The Deed of Release is immaterial to the authority of the Bank to settle the LMO Dispute.


## 3.   THE ARBITRATION PROCEEDINGS

The request for arbitration, dated 10 July 2003, and submitted by Frontera has been received by SOCAR on 23 July 2003.

Frontera appointed Mr Kaj Hobér, attorney at law, Mannheimer Swartling Advokatbyrå, as its arbitrator. SOCAR appointed Mr Christer Thingwall, attorney at law, P. O. Box 7076, 103 87 Stockholm, as its arbitrator. Mr Kaj Hobér and Mr Christer Thingwall asked former Judge Bengt G Nilsson, Bengt G. Nilsson Arbitration AB, P. O. Box 1343, 181 25 Lidingö, to be chairman of the Arbitral Tribunal. Mr Nilsson accepted this appointment. On appointment by the Arbitral Tribunal Ms Helga Hullman, Judge Referee, the Swedish Supreme Court, served as secretary of the Tribunal.

Following orders by the Tribunal, the Parties have submitted a number of written briefs.

The final oral hearing took place on 7–10 March 2005, in Stockholm. During this hearing the Tribunal heard testimonies by the following persons: Messrs. William Daughtrey, Lan Bentsen, Steve Nicandros (Chairman and CEO of Frontera), Arif Yukler (the General Manager of Salyan Oil) and Peter Castle (Counsel) at the request of Frontera, and Messrs. Natik Aliyev (President of SOCAR), Valery Aleskerov (the Head of the Foreign Investment Department at SOCAR), Simon Browne-Wilkinson (QC) and Mr Farrukh Gassimov at the request of SOCAR. In addition the Parties have submitted a comprehensive documentary evidence.

The Tribunal met for deliberation on 13 June, 24 August and 25 October 2005.

# 4.  THE PARTIES' PRAYERS FOR RELIEF AND THE LEGAL GROUNDS RELIED ON BY THE PARTIES

## 4.1  The claims

**Frontera** requests that the Arbitral Tribunal shall order SOCAR to pay to Frontera a principal amount of USD 15,737,447 plus interest on the said principal amount at the rate of LIBOR plus four percent (4%) per annum in the amount of USD 5,561,771. This principal amount is derived from the following:

A.  Frontera is entitled to recover its damages for SOCAR's failure to pay for oil delivered in the last quarter of 1999 and first quarter of 2000 (15 November 1999 – 31 March 2000) in the amount of USD 2,274,499.

B.  Frontera is further entitled to recover USD 1,968,709 from SOCAR representing the value of the oil shipments wrongfully seized in the fall of 2000 (November – December) by SOCAR from Frontera and never paid for at all.

C.  Finally, Frontera is entitled to recover USD 11,494,238 for the shipments taken by SOCAR at LMO price instead of the netback (market) price in the period 1 January 2001 to 7 March 2002.

Calculations of the claims and interests are summarised in detail in **Appendix 1**.

SOCAR denies liability in respect of the claims A. and B. because any and all claims between the Parties, which relate to the LMO Dispute, were settled and finally resolved by the July 2002 Protocol. Further, any funds due to Frontera from the period 1999/2000 were recouped by Frontera between April and November 2000. SOCAR denies liability also for claim C., because the December 2000 Protocol states that Frontera has to deliver oil to SOCAR in the subsequent period at LMO price. SOCAR argues in its post-hearing brief also that the July 2002 Protocol covers claim C. and, consequently, that claim C. in any case was finally settled by this Protocol.

**Frontera** asserts that SOCAR's attempt to raise this new defence to Frontera's claim C. for the first time in its post-hearing brief violates the UNCITRAL Rules and is unfair and prejudicial to Frontera.

## 4.2  The counterclaim

If the Tribunal concludes that the July 2002 Protocol is not a valid agreement, SOCAR requests the Tribunal to consider **SOCAR**'s total counterclaim of USD 11,199,771 calculated as follows:

During the time period from November 1999 to the end of 2000 the Contractors sold 126,916 mt at a World Market Price of 177,13 USD/mt, totalling USD 22,480,631. Less SOCAR's debt to Frontera for oil delivered in 1999/2000 (USD 4,112,010) and less the LMO price, which would have been paid by SOCAR for oil delivered between April and November 2000 (USD 7,163,790), the Contractors owe SOCAR USD 11,199,771. According to the PSA Frontera and Delta/Hess are jointly and severally liable for this debt. Thus, Frontera is liable also for Delta/Hess' share of the debt. Frontera had been notified of this claim. The LMO Dispute was the subject of the Parties' discussion in December 2000 and in 2001.

**Frontera** requests that the Tribunal dismiss the counterclaim in its entirety, because SOCAR did not provide Frontera with the requisite notice of this claim before submitting it to arbitration (PSA Article 26.3). Frontera contests the counterclaim and cannot accept any figures, calculation or amount as reasonable or correct *per se*.

## 4.3  The claims concerning costs of arbitration

**Frontera** also claims that the Arbitral Tribunal shall order SOCAR to compensate Frontera for its costs in this arbitration including all legal fees, costs and expenses incurred in pursuing its claim against SOCAR and to bear, as between parties, the arbitration costs including payments to the Arbitration Institute and expenses and fees for the Arbitral Tribunal. In addition to its general powers, the Arbitral Tribunal has the power to award costs and damages as necessary under the PSA and under Article 26.2 of the PSA (PSA, Appendix 6).

**SOCAR** pleads that Frontera's claim be dismissed with payment to SOCAR of its costs. SOCAR further submits that, if the Tribunal would dismiss Frontera's claims, the Tribunal is requested to consider that Frontera should never have pursued the arbitration and that costs should be awarded in favour of SOCAR on an indemnity basis.

In making any award of costs under UNCITRAL Rules Article 38 (e) SOCAR, if successful, would wish the Tribunal to have regard to the behaviour of Frontera in framing its claims and supplying information to SOCAR in order that it may properly defend itself.

## 4.4 The Parties assert the following grounds and make the following contentions

### 4.4.1 Frontera's claims

**Frontera:**

The PSA is an enforceable contract under Azeri law. It constitutes a law of the Republic of Azerbaijan that takes precedence over any inconsistent law, decree or administration order, upon approval by the Parliament of the Republic of Azerbaijan (PSA Article 26.1). The PSA has not been amended or superseded by any other law in Azerbaijan. Moreover, the PSA is expressly subject to the international legal principle of *pacta sunt servanda* (PSA Article 26.1). Under the terms of the PSA, Frontera was charged with producing oil. After the oil was produced, title to the oil was transferred to the Contractor Parties. Thus, Frontera owned a percentage of the oil at issue in this case.

Beginning in the last quarter of 1999 and continuing through the second quarter of 2000 (November 1999 – March 2000) Frontera produced oil and delivered it in accordance with Article 14.1 of the PSA. SOCAR was obliged to pay for what it received immediately upon delivery but SOCAR has never paid anything for the oil pursuant to the PSA. SOCAR never paid Frontera for this oil and SOCAR therefore breached the PSA. The total owing is USD 2,274,499 (**Claim A.**). SOCAR acknowledged that SOCAR had not paid and also that the LMO obligation on the part of Frontera had been fulfilled.

Because amounts payable by SOCAR to Frontera were unpaid for two consecutive calendar quarters, Frontera was entitled, under the PSA, to cease sales of LMO to SOCAR (PSA Article 14.4). In order to reinstate SOCAR's entitlement to delivery of oil, SOCAR was required to pay the outstanding amount (PSA Article 14.4). Only after payment by SOCAR of the outstanding amount would Frontera become obligated to resume sales of LMO to SOCAR (PSA Article 14.4). Because SOCAR did not pay for the oil, SOCAR never reinstated the PSA.

Frontera was therefore in April 2000 entitled to export the oil on the world market (PSA Article 21.2). The PSA does not require that Frontera provide any notice of exporting. Nonetheless, Frontera advised SOCAR that it would cease LMO sales. Frontera and SOCAR agreed to suspend the purchase of LMO as from 1 April 2000 in accordance with Article 14.3 of the PSA. SOCAR also acknowledged that Frontera had fulfilled its obligations to deliver LMO. As a result, commencing in April 2000, Frontera attempted to export the oil for sale to third parties.

The proceeds received from the sale of this oil were to go to Frontera (Article 21.2) and SOCAR had no right to use Frontera's proceeds to offset SOCAR's debt. SOCAR had never notified Frontera to resume the purchase of LMO (Article 14.4) and Frontera never became obliged to resume the sale of LMO.

However, SOCAR compounded its initial breach of the PSA and in contravention to the express terms of the PSA placed an economic stranglehold on Frontera in November 2000 by instructing Azeri Customs Authorities not to permit the export of crude oil from Azerbaijan by Frontera. Azeri customs officials complied with this dictate from SOCAR and Frontera's trainloads of oil destined to export were stopped in transit. SOCAR blocked Frontera's export of oil and Frontera could not sell its oil to others. SOCAR's acts were in complete disregard for cash payment (Article 14.4) and arbitration (Article 26.3) and was a breach of the PSA (Article 21.2). Frontera asked for assistance to resume exports of oil but SOCAR refused. The halting of exports was not allowed in PSA as remedy for SOCAR if it believed that Frontera was in violation of its obligations. In November and December 2000, SOCAR then seized 24,344 tons (corresponding to 170,894 barrels) of oil from Frontera without ever paying for it (**Claim B.**). At that time Frontera had the right to export 100% of the oil on the world market. Frontera was during this period subject to non-economic and extensive financial duress by SOCAR. SOCAR was well aware of the pressure it was placing on Frontera. The only source of cash flow for Frontera was the oil produced in the Kursangi and Karabagli fields. The halting of cash flow led to the Bank's foreclosure on Frontera's interests in the PSA, and on the loan. With zero cash flow and significant operating and work program expenses, and facing the possibility of losing the PSA, Frontera was forced to agree to the December 2000 Protocol.

When the December 2000 Protocol was signed, SOCAR simply took oil from the PSA production and paid for the oil at the LMO price rather than the market price in the period January 2001 through March 2002 (**Claim C.**). The "payment" by SOCAR to Frontera was sometimes made by means of an offset pursuant to this protocol. No right of offset existed in the PSA. Moreover, the oil at the time was no longer subject to the LMO purchase option insofar as that LMO option by the express terms of the PSA could only be restored by payment for the prior oil taken (PSA Article 14.4). During this period Frontera was entitled to export the oil valued at the world market price. SOCAR as a result paid much less than the market price for the oil, to the significant detriment of Frontera. SOCAR's payment is therefore a breach of the PSA, and an unjustified profit for SOCAR.

By the December 2000 Protocol SOCAR exempted itself from having to pay for its debts to Frontera. This Protocol should be interpreted restrictively and against SOCAR, who drafted the protocol and was at the time in breach of the PSA. The December 2000 Protocol is ineffective and unenforceable for several reasons. The PSA could not, by its own express terms, be amended in any way without express approval of the Parliament of the Republic of Azerbaijan (PSA Article 26.1). Therefore Frontera's rights under the PSA could not have been transferred to the Bank.

The December 2000 Protocol is not a valid amendment to the PSA, because it never received parliamentary approval. Further, it was not executed by all parties thereto (it was never signed by SOA and Delta/Hess) and it is therefore null and void. Frontera was forced to agree under duress to the Protocol. Frontera was also subject to non-economic duress by SOCAR. The protocol is therefore voidable. The Protocol also contravenes basic principles of contract law, because it was entered into without any legal consideration, since SOCAR only agreed to take steps that SOCAR was already contractually obliged to take. It was only an interim solution of the problems in connection with the storage of oil. Frontera never affirmed the Protocol, and has therefore not waived its rights to have the agreement voided. After the conclusion of the agreement in the December 2000 Protocol Frontera attempted in good faith to settle the LMO Dispute with SOCAR. However, these attempts failed because Frontera was still under duress. The mere lapse of time, be it three years or more, does not

merit the conclusion that Frontera accepted the Protocol. In any case, SOCAR remains liable to pay for the oil since the protocol does not state that SOCAR is entitled to the oil for free.

SOCAR's conduct constitutes also an unlawful taking of oil under Article 26.3 (b) of the PSA. Frontera is entitled to full indemnification by SOCAR at full market value for its oil and its rights and interests under the PSA. In addition, under the PSA, SOCAR waived any and all claims to immunity, including any claims to sovereign immunity. Therefore, SOCAR is responsible for fully indemnifying Frontera for the oil taken.

## SOCAR

### Claims A. and B.

All LMO claims relating to 1999/2000 (**Claims A. and B.**) were resolved by the July 2002 Protocol.

Frontera had a financing arrangement with the Bank. As a result of Frontera's default the Bank exercised its right to call in its security interest represented by Frontera's share in the PSA. Frontera was required to assign its share in the PSA to the Bank and accordingly executed the Security Assignment.

Article 2 of this agreement provides: "The Assignor ... assigns, and agrees to assign, absolutely to the Bank, all of the Assignor's rights, benefit, title and interest, present and future in, to and under the Assigned Project Documents...". Article 3 provides: "... the Assignor shall, ... be entitled to exercise and enforce all or any of its rights... under the Assigned Project Document...".

This agreement is an absolute assignment of Frontera's rights and liabilities.

However, any right, which Frontera had to bring a claim in respect of LMO deliveries in 1999 and 2000, was varied by the execution of the Deed of Release. The provisions of this agreement provide the Bank with an unfettered right to resolve the LMO Dispute.

In Paragraph (L) of the preamble to this agreement the Parties thereto acknowledge the existence of a dispute between SOCAR and the Parties to the PSA. This paragraph provides: "At the date of this Deed there are outstanding disputes among SOCAR, SOA, the Bank (pursuant to its rights under the

Security Agreements) and Delta/Hess relating to deliveries of, and payments for, Local Market Oil... in 1999 and 2000...".

Clause 5 (a) states: "Each of the Frontera Companies represents and warrants to the Bank that: (a) it has no claim, cause of action, right of set-off, counter-claim or recourse against the Bank which is based on or related in any way to the LMO Dispute, including without limitation, any negotiations related to a settlement of the LMO Dispute".

Clause 6 (c) states that Frontera agrees that "it has no objection to any settlement of the LMO Dispute which results in the termination and release of any claims which Frontera Azerbaijan and SOCAR may have against each other under or in respect of the LMO Dispute and confirms that the Bank shall be authorised in its sole discretion to settle the LMO Dispute on such other terms as it sees fit."

It is therefore clear that the Bank was authorised to settle the LMO Dispute without recourse to Frontera, pursuant to the terms of the Deed of Release. The Bank thereafter proceeded to negotiate with SOCAR in order to secure SOCAR's consent to the Security Assignment of Frontera's share in the PSA, as required by the PSA (Article 25.2).

The negotiations resulted in a settlement contained in the July 2002 Protocol which the Bank was entitled to and authorised by Frontera to negotiate and sign.

Paragraph 2.2 of this agreement provided that "... SOCAR is deemed to have met with all its obligations with respect to payment for LMO... during period 1 November 1999 to 31 December 2000...". It further provides that the Bank "...agrees to make no further claim with respect to payment from SOCAR for non-payment by SOCAR of (a) LMO deliveries from 1 November 1999 to 1 April 2000 and (b) deliveries of crude oil to SOCAR during December 2000". In consideration for this agreement SOCAR agreed to make no further claims in the LMO Dispute regarding the relevant period (paragraph 2.1 and 2.3).

The Bank did not conclude its involvement in the PSA on 7 March 2002. The transaction was not concluded until 4 July 2002. It could not be completed until SOCAR had approved the transfer and this was done on 4 July 2002.

SOCAR has been notified that the Bank took over Frontera's rights and liabilities. The fact that the Deed of Release is not referred to in the July 2002 Protocol is immaterial. The Bank did finally resolve the LMO Dispute.

In English law, there is no requirement that SOCAR should be a party to the Deed of Release to enable it to rely on the terms of the Deed as evidence of the Bank's authority.

*Alternatively*, any funds due to Frontera from the period 1999/2000 were recouped by Frontera between April and November 2000 when all oil produced was sold by Frontera on the world market rather than at LMO price to SOCAR. The total revenue earned in this period by Frontera was in excess of USD 14 million. Frontera had no right to export oil on the world market in 2000 because Article 14 of the PSA had not been triggered.

Frontera had only a right to report its share as calculated in accordance with terms of the PSA (Article 21.2). Where this was not determined, the oil remained the property of the state until duly accounted for. As soon as production began Frontera recognized that it was in financial difficulty and needed to change the terms of its agreement with SOCAR. Frontera obtained SOCAR's agreement in February 2000 to sell LMO on the world market without time limit. Frontera wanted to export and did not want to be paid by SOCAR.

PSA Article 14.1 provides that Frontera had an obligation to sell a fixed amount of crude oil, known as LMO, to SOCAR. A schedule setting out the annual quantity of LMO to be delivered appears in Appendix 11 to the PSA. Monthly quantities were to be agreed upon. Frontera did not deliver the required quantity of LMO in November/December 1999 or in the first quarter of 2000 in breach of the PSA. It was not due to any action of SOCAR. Article 14.2 (a) provides that where there is a shortfall in deliveries it will be paid back by the Contractor to SOCAR in full in crude oil of similar quality in the month following the relevant calendar quarter. Frontera did not comply. As at the end of the first quarter in 2000, SOCAR had not paid for the LMO delivered. The PSA did not state when SOCAR should make the payment. However, the measurement and accounting procedures of the PSA grant the Parties the right to submit commercial invoices once the accounting for the oil produced has been done and agreed upon. No invoice had been received. Article 14.4 means that the earliest payment would become due to Frontera would have been July

2000. Frontera, however, incorrectly and without proper notification to SOCAR, chose to cease LMO deliveries at the end of the first quarter (in April) in 2000 and delivered on the export market until 14 November 2000.

SOCAR rejects all contentions by Frontera that the low production capacity of the oil fields was due to SOCAR. Every foreign investor was entitled to purchase data on the fields. The information is provided without warranty and it is the right of the investor to verify and/or replace the data he has been given. The fields had not deteriorated between April and November 1999, *i.e.* between the date when the PSA license became effective and the start of production. Frontera had overestimated the production capabilities of the fields. It was unable to produce any oil for sale on the world market and needed desperately to be in a position to generate revenue presumably to service the debt to the Bank. SOCAR agreed that Frontera could export oil on the world market from 1 April 2000 and Frontera could recoup what SOCAR owed from this amount and generate revenue. Frontera's relaxation of its obligation to deliver LMO was intended to be temporary but Frontera continued to export despite that SOCAR asked Frontera to stop.

SOCAR attempted to resolve this issue with Frontera. SOCAR had a number of additional concerns; the "Delivery point" had not been agreed upon and Salyan Oil, the operator, had failed to provide any accounting information to enable SOCAR to calculate quantities delivered and amounts due. Frontera operated Salyan Oil. It was recognized by each of the Parties involved that Frontera was the dominant partner. Frontera refused to deal with the problems. The Parties had not agreed to a delivery point. Frontera's action was causing serious concern at SOCAR, which, as a state entity responsible for the production of oil, and, in an attempt to halt the flow of oil, instructed the Customs Authorities to seize a quantity of oil on 14 November 2000. SOCAR had no option but to withdraw its permission to export, given on 10 February 2000. The Parties sought to solve these issues by discussing them; SOCAR attempted to treat Frontera as a "Joint Venture Partner".

*Claim C.*

The result was a meeting between the Parties at which the December 2000 Protocol was negotiated. The negotiations regarding this agreement were con-

ducted by the Foreign Investment Department of SOCAR. This agreement is valid and enforceable. The terms of the PSA provide the Parties with an ability to amend the PSA but the December 2000 Protocol is not an amendment to the PSA, only a restatement of rights which provides details in addition to the terms of the PSA, without requirement to refer the Protocol to the Azeri Parliament. Frontera was not forced to sign it by duress. SOCAR did not apply any pressure on Frontera. Frontera's economic situation was good. Because of the exports, Frontera's financial position in December 2000 must have been significantly better than could have been anticipated. Frontera had also the possibility to invoke arbitration. SOCAR does not have a copy of the Protocol signed by Delta/Hess. This does not affect the validity of the document. In any way, in the preamble of the July 2002 Protocol, Delta/Hess acknowledged that they were a party to the December 2000 Protocol. The purpose of the December 2000 Protocol was to attempt to correct the situation. It did not alter the delivery requirements of LMO already set out in the PSA. It restated the obligation of Frontera to deliver LMO to SOCAR. It is an affirmation of the Parties' rights and obligations. Frontera had no entitlement to deliver oil on the world market unless their LMO obligations had been fulfilled. The claim for the difference in value of LMO and world market price for the period of January 2001 to March 2002 is therefore without foundation.

If the Tribunal finds that Frontera signed the December 2000 Protocol under duress, the doctrine of duress operates to render a contract "voidable" not void. Frontera took no steps in 2001 to reject the December 2000 Protocol and operated in accordance with its terms. No steps were taken until May 2003, almost two years after the Bank had called in their loan.

### Frontera:

The 4.7 million USD in cash losses suffered by Frontera as a result of actions of SOCAR ultimately led to Frontera's default in its obligations to the Bank, whereupon the Bank took non-juridical actions upon its security interest and notified SOCAR on 1 July 2001 that it was taking over Frontera's participating interest in the PSA. The Security Assignment by which the Bank took over Frontera's participating interests in the PSA, to the extent that such interests covered Frontera's obligations to the Bank, was not an absolute assignment of

all rights of Frontera. Since the Security Assignment between the Bank and Frontera never expressly assigned Frontera's accrued debts to the Bank, the debts are deemed to remain with Frontera. Frontera's rights to pursue relief for SOCAR's non-payment for LMO remained at all time with Frontera, and there-fore could not have been settled by the July 2002 Protocol. This protocol is not a release of Frontera's claims. The Security Assignment expressly states that Frontera is "entitled to exercise and enforce all or any of its rights, discretions, and remedies under the Assigned Project Document" (Article 3.1) Instead, the Bank was entitled to exercise certain rights of Frontera if it so chose. The Bank was also entitled to delegate any of those rights to any other party, including Frontera. Frontera did not give up the right to pursue settlement of its dispute with SOCAR. Frontera retained a right to resolve the LMO Dispute. The mutual releases in the Deed of Release indicate also that the Parties recognized that Frontera retained a right to resolve the LMO Dispute. The term "LMO Dispute" in the Deed of Release comprises, however, only Claim A. Moreover, on 7 March 2002 the Bank concluded its involvement in the PSA when it sold its Participating Interest in the PSA. The Bank gave 2,8 MUSD of the proceeds of that sale to Frontera on 24 July 2002. Frontera's obligations to the Bank were, as of that date, completely satisfied. Therefore, the Security Assignment termi-nated. That agreement was no longer of any force or effect, and to the extent Frontera's rights were assigned to the the Bank, they have reverted back to Frontera on 24 July 2002 because Frontera had a continuing interest in the PSA.

Frontera's rights under the PSA could not have been transferred to the Bank; the PSA could not be amended without the Parliament's approval.

Frontera's damage claims were never assigned to the Bank; the Bank be-came a party to the PSA with SOCAR as of 4 July 2001. The Bank's assumption of the contract did not operate to release SOCAR for its wrongful conduct and damages suffered by Frontera prior to the assumption on 4 July 2001. More-over, after 4 July 2001 and until the Bank sold the contract rights to a third party, the Bank was acting under PSA on behalf of Frontera. Accordingly, Frontera's rights to collect damages from SOCAR and sales proceeds in excess of the loan from th Bank remained viable.

Alternatively, to the extent any of Frontera's rights or claims were assigned to the Bank, the Bank did not collect or compromise such claims. Nor was any

such assignment of rights exclusive of Frontera's rights to pursue the claims. Indeed, when the Bank concluded its interests in the PSA, the Bank and Frontera specifically recognized that Frontera continued to have claims against SOCAR. The Bank and Frontera agreed that the Bank could pursue a settlement of the LMO Dispute, which could result "in the termination and release of any claims which Frontera Azerbaijan and SOCAR may have against each other under or in respect of the LMO Dispute...". The Bank did not settle or compromise the LMO Dispute in such a way as to terminate or release any rights of Frontera against SOCAR. Frontera and the Bank also specifically recognized that their agreement did not give any rights to any entities, such as SOCAR, who are not parties to the Bank agreement. Additionally, a significant portion of Frontera's claim is not encompassed by the LMO Dispute, as defined by the Bank.

The Security Assignment does not amend the PSA and does not alter the definitions of LMO and "Crude Oil", as set forth in the PSA. The Deed of Release was executed after the March 2002 sale of Frontera's interests in the PSA. SOCAR is not a party to this agreement and has no right to seek its enforcement. It is not an amendment to the PSA. Even the July 2002 Protocol was executed after the March sale. Frontera is not a party to this agreement and is not bound by any other party. Moreover, this agreement encompasses only a narrowly defined "1999/2000" LMO Dispute and the amount in dispute was never paid. There is no mention of a release of claims for shipments made between January 2001 and March 2002. However, the purported release is not supported by consideration; or was only entered into on the mistaken belief as to the reality of SOCAR's claims.

To the extent the Tribunal finds that the Bank's action somehow bound Frontera to the July 2002 Protocol, then Frontera asserts that the continued duress subsequent to the signing of the December 2000 Protocol ultimately led to the July 2002 Protocol, which therefore cannot be enforced against Frontera.

None of the four documents is a release of Frontera's claims. The Parties all remain bound by the original PSA, which is the only relevant document that has the force of law in Azerbaijan. All other agreements are secondary to the PSA and SOCAR's instigation of the Bank and participation in the breach of duty of the Bank as mortgaged in possession.

It was the low capacity of the oil fields transferred by SOCAR to Frontera which caused Frontera to be unable to meet the LMO schedule. Frontera is therefore entitled to rely on the Force Majeure provision in Article 24.1 of the PSA. Article 14.1 (b) of the PSA underscores that Frontera is only obliged to sell a portion of the oil it extracts. Nonetheless, in the last quarter of 1999 and the first quarter of 2000, Frontera shipped to SOCAR 100% of the crude oil that it produced. Frontera acted at all times in accordance with the terms of the PSA. SOCAR acknowledged the sufficiency of Frontera's delivery.

The Parties agreed not on a monthly but on an annual schedule of LMO deliveries.

Frontera took over the Project in mid-month and can therefore not be charged with the oil requirements for the full month of November 1999. Further, to the extent there was a shortfall in December 1999, the January 2000 delivery of 13,370 mt of LMO made up for any fourth quarter under-delivery.

The delivery point was settled by the Parties.

Salyan Oil was the operating company under the PSA (Article 9). It was formed and owned by the Contractor Parties. Frontera did not exercise direct or exclusive control over Salyan Oil. Salyan Oil delivered all accounting information as required by SOCAR.

Article 26.3 of the PSA requires negotiations 30 days prior to submitting the dispute to arbitration. Frontera has never been put on notice of SOCAR's demand for the difference in value between the LMO price and the World Market price for oil delivered in 2000. This last-minute claim (**the Counterclaim**) is a tactic made solely for purposes of leverage in the dispute. The counterclaim should therefore be dismissed in its entirety. In the July 2002 Protocol, SOCAR agreed to release its counterclaim against Frontera (Article 2.3). SOCAR's counterclaim has therefore no merit and should be summarily dismissed. SOCAR is bound by its statements in the letter of 10 February 2000. The counterclaim must therefore be denied. However, SOCAR cannot point to any contractual violation on Frontera's part in choosing to export oil abroad. SOCAR cannot now claim a remedy of offset that is not available to it in the PSA, which states termination of the PSA or arbitration as remedies.

SOCAR's pursuit of its counterclaim constitutes a failure of consideration. Because of this failure, the purported release is by the way unenforceable.

SOCAR's interpretation of Article 14.4 is not supported by the language of the PSA. This Article uses the present tense phrase as the standard for determining when Frontera may cease LMO deliveries. The present tense suggests that payment was due immediately upon the conclusion of the calendar quarter. Frontera maintains that the second quarter of non-payment ended in March 2000. Thus, beginning in April 2000, Frontera had the right, under the PSA, to export oil at world market prices.

When Frontera entered into the December 2000 Protocol, it believed that it was simply a temporary solution and it was not until much later that Frontera realized that SOCAR was not interested in working towards a settlement of the dispute. Frontera attempted to continue negotiating the LMO Dispute but without success. Frontera did not have the opportunity to move forward with arbitration against SOCAR pending the transfer of its interest to the Bank until the sale of the interest was completed in 2002.

## 5.   REASONS FOR THE AWARD

### 5.1   Procedural matters

#### 5.1.1 Applicable law

Article 26.1 sets forth, as contended by SOCAR, the substantive law, which is to be applied to enforce and determine the rights and obligations of the Parties under the PSA. The Arbitration agreement further refers in Appendix 6 to the UNCITRAL Rules. These Rules provide in Article 33 (1) that "[t]he arbitral tribunal shall apply the law designated by the parties as applicable to the substance of the dispute".

SOCAR has added that the PSA is an internationally recognized standard form of oil and gas production sharing agreement and that it must be interpreted and understood in the light of the industry practice and in accordance with its proper law. The Tribunal agrees in principle with SOCAR's contention that the PSA shall be interpreted and understood also in the light of industry practice. However, SOCAR has not provided any compelling evidence as to this practice. The Tribunal therefore concludes that it must apply the provisions in Article 26.1 when determining the rights and obligations of the

Parties under the PSA, since this provision contains the law designated by the Parties as to the substance of the dispute.

The Parties rely on other documents than the PSA as to the fundamental issue whether any dispute has been settled and whether Frontera as a matter of law has assigned to the Bank its contractual claims against SOCAR. To the extent such other documents have their own choice of law provisions, the Tribunal is bound to apply these provisions.

Further, SOCAR relies on allegedly independent agreements, such as the agreement in connection with the February 2000 letter. SOCAR submits that for such matters without any choice of law provisions, allegations founded in tort or matters founded on equitable principles, allegedly falling outside the contractual relationships, the proper law is Azeri law as the place where the relevant agreement was entered into or the alleged harm occurred. In this respect SOCAR again refers to Article 33 (1) of the UNCITRAL Rules, which provides that failing an agreement by the parties as to the applicable law, the Arbitral Tribunal shall apply the law determined by the conflict of law rules which it considers applicable. In this respect Frontera argues that Mr Aliyev testified that the February 2000 letter was not a separate agreement subject to Azeri law. Lastly, Frontera relies on the overriding principle of *pacta sunt servanda* and the fact that the PSA cannot be amended or varied by the Parties, without the permissions of the Azeri parliament, since the PSA has been adopted by the parliament as Azeri law. The Tribunal will deal with these arguments later.

### 5.1.2 Late submissions

Frontera raised the argument of unjust enrichment for the first time at the oral hearing. SOCAR submits that it would be procedurally unfair in accordance with Article 20 of the UNCITRAL Rules, if this aspect of Frontera's case was to be considered at such a late stage of the proceedings.

Article 20 of the UNCITRAL Rules provides that either party may amend or supplement his claim or defence during the course of the arbitral proceedings unless the Arbitral Tribunal considers it inappropriate to allow such amendment having regard to the delay in making it or prejudice to the other party or any other circumstances.

When Frontera raised the concept of unjust enrichment during the hearing, the Tribunal decided to allow Frontera to develop its arguments further on this issue in a post-hearing brief and SOCAR to submit a subsequent separate defence on the same issue. The Tribunal ordered the Parties to submit such post-hearing briefs by certain dates in the first half of April 2005, well in advance of the written final statements, which in accordance with an agreement between the Parties were due on 16 May 2005. Thus, the Tribunal finds that the late submission of the argument based on the concept of unjust enrichment did not cause any delay of the proceedings or prejudice to SOCAR, which was afforded sufficient opportunities to develop its defence. For the reasons stated the Tribunal concludes that it is in full compliance with Article 20 of the UNCITRAL Rules to permit Frontera to supplement its claim with respect to this new argument.

SOCAR's post-hearing brief contains a number of new contentions as to the quantum of Frontera's claims. Frontera requests the Tribunal to reject all new evidence and arguments advanced by SOCAR for the first time in its closing submission in order to prevent SOCAR from benefiting by its own failure to observe the rules of arbitration. SOCAR responds that the figures detailing the calculation, which according to Frontera give rise to its claims, were not produced until the hearing. As a result SOCAR contends that it has been unable to comment on the way in which the claims have been prepared.

Frontera objects to SOCAR's assertion that the details of the calculation were not produced until the hearing and relies on an affidavit by Mr William Daughtrey according to which the figures that SOCAR refers to were submitted to SOCAR prior to the initiation of the arbitral proceedings. Mr Daughtrey states in this affidavit that he presented a detailed calculation of the claims to Mr Natik Aliyev at a meeting at SOCAR's office in Baku in May 2003. Annexed to Mr Daughtrey's affidavit is a copy of the calculations, which he presented to Mr Aliyev. Frontera further asserts that Frontera redelivered a copy of these calculations to counsel for SOCAR prior to the Parties' closing briefs.

The details of Frontera's calculations were presented to the Arbitral Tribunal for the first time in connection with the testimony by Mr Lan Bentsen at the hearing. The Tribunal notes that Mr Bentsen's presentation included a number of details and explanations that are not reflected in the document, which Mr

Daughtrey delivered to Mr Aliyev in May 2003, such as the netback price used and the method of conversion from tonnes to barrels. Consequently, the Tribunal considers that it was appropriate and even necessary for SOCAR to deal with Frontera's method of calculation in its closing brief. In a letter to the Parties dated 5 July 2005 the Tribunal invited Frontera to comment on SOCAR's new contentions as to the calculations. Thus, Frontera has had an opportunity to respond to SOCAR's new contentions.

Frontera also objects to a number of other new contentions and new "unsubstantiated evidence" in SOCAR's closing arguments. While it is true that SOCAR's closing arguments seem to contain assertions about facts that are completely new, they are not, as Frontera admits, supported by any evidence.

The Arbitral Tribunal rejects Frontera's request to disregard the new "unsubstantiated evidence" and the new arguments advanced by SOCAR for the first time in the closing submission since the new submissions are permissible *per se* in the circumstances of the case and are not supported by evidence and therefore remain mere statements.

### 5.1.3 The terms of reference and jurisdiction of the Tribunal

As to Frontera's claim based on unjust enrichment SOCAR also submits that such matters fall outside the terms of reference of the Tribunal in accordance with the terms of the arbitration agreement as set out in Article 26.3 (a) of the PSA, since the arbitration agreement must be interpreted to cover only those matters arising out of the PSA. Non-contractual disputes and measures of compensation, which are unrelated to the contractual rights of the Parties do not, according to SOCAR, come within the scope of Article 26.3 (a).

Article 26. 3 (a) refers to the "Arbitration Procedure and the applicable law provisions of Article 26.1". The Arbitration Procedure is laid down in Appendix 6 of the PSA. This Appendix provides that *all* (emphasis by the Tribunal) disputes arising between SOCAR and any or all of the Contractor Parties, including, without limitation, any dispute as to the validity, construction, enforceability or breach of the Agreement, shall be finally settled by arbitration. By its clear terms the arbitration agreement comprises all disputes between the Parties in connection with the PSA, not just disputes arising out of the PSA. Further, according to the law of arbitration in Sweden it is an established prin-

ciple that arbitration agreements should be interpreted in a reasonably exten-
sive manner. Consequently, the Tribunal holds that its jurisdiction includes
claims based on the concept of unjust enrichment.

Frontera has also submitted a claim for compensation based on Article 26.3
(b). In this respect Frontera contends that SOCAR's conduct constitutes an
unlawful taking of oil and a taking or expropriation of Frontera's rights and
interests under the PSA – a claim which Frontera forwarded already during the
exchange of briefs prior to the hearing. SOCAR submits that the Tribunal has
no mandate either under the UNCITRAL Rules or under any relevant laws of
Sweden to assume jurisdiction over this claim.

Frontera has responded: Article 26 of the PSA recites the Parties' agreement
as to the governing law and arbitration. General principles of public interna-
tional law are integral parts of the applicable laws referred to in Article 26.1 of
the PSA. Article 26 is broadly drawn to provide for arbitration of all disputes
and to provide the Parties with complete relief, including relief under interna-
tional principles of law as applicable. The arbitration procedures described in
Appendix 6 of the PSA further recite the Parties' agreement to submit "all dis-
putes" between Frontera and SOCAR to the Tribunal for resolution.

The Arbitral Tribunal holds as follows.

Article 26.3 (b) of the PSA refers to the right of the Contractor Parties pursu-
ant to Articles 11 through 15 of the Law of Protection of Foreign Investment,
which were made applicable in addition to any other rights the Contractor may
have under the agreement. The article goes on to say that in such a case the
arbitrators shall apply the principle of prompt, full and effective compensation.
It follows from this provision that claims under Article 26.3 (b) may be referred
to arbitration. However, the Tribunal agrees with SOCAR's argument that this
article envisages that the entire Project be expropriated, nationalized or taken
by the Azeri Government for a claim to arise and that in such circumstances the
proper claimant is the Contractor, not Frontera, as one of the Contractor Parties.
This conclusion is further supported by the method of valuation prescribed in
Article 26.3 (b):

...... the full market value, on the basis of an on-going concern utilising the discounted cash flow method, assuming a willing buyer and seller in a non-hostile environment, and disregarding the unfavourable circumstances under which or following which Contractor shall be deprived of his rights.

This is the formula that usually is employed under international law in order to valuate property, when an entire enterprise belonging to a foreigner has been nationalized or confiscated. Consequently, the Tribunal holds that Frontera has no standing to submit claims under Article 26.3 (b) or any other principles of public international law or any relevant investment protection legislation.

## 5.2    Matters of substance

### 5.2.1 Has the Bank in the July 2002 Protocol settled Frontera's claims in the arbitration with binding effect for Frontera?

SOCAR contends that the Bank has settled Frontera's claims and that, consequently, these claims must fail. The Tribunal therefore approaches this contention first.

Frontera's first objection is that Frontera's rights under the PSA could not have been transferred to the Bank since the PSA could not be amended without the approval by the Azeri Parliament. In the view of the Tribunal this objection is not correct. Article 25.2 (b) (ii) of the PSA contains an express rule which permits each Contractor to freely mortgage, pledge or otherwise encumber its interests in the PSA or any property in or outside Azerbaijan. Thus, no amendment of the PSA was necessary in order to assign Frontera's rights under the PSA to the Bank as a measure to give effect to such a mortgage or pledge.

The Security Assignment is a contract between Frontera and the Bank, whereby Frontera assigns its rights pursuant to the PSA to the Bank. This contract has its own choice of law provision, which provides that it is governed by English law. According to Clause 7 of the Security Assignment the assignment should become enforceable on the occurrence of an event of default under the loan agreements referred to in the Assignment (the Borrowing Base Loan Agreement and the Convertible Loan Agreement between Frontera Resources Caucasus Corporation and the Bank).

Thus, Clause 7 provides:

> The security constituted by this Assignment shall become immediately enforceable and exercisable upon and at any time after the occurrence of an Event of Default in accordance with each of the Loan Agreements.

Clause 8 contains provisions regarding the method of enforcement of the security. It provides:

> 8.1 After the security constituted by this Assignment has become enforceable, the Bank, subject to the terms and conditions of the Assigned Project Documents shall be entitled without notice immediately to put into force and exercise all the powers and remedies possessed by it as Bank of the Assigned Project Documents as and when it may see fit and particular:
>
> ----------
>
> (c) to take over or institute all such proceedings in connection with all or any part of the interest of the Assignor in the Assigned Project Documents as the Bank in its absolute discretion thinks fit and to discharge, compound, release or compromise all or any part of the interest of the Assignor in the Assigned Project Documents or claims in respect thereof;
>
> ----------------
>
> (e) to settle, arrange, compromise or submit to arbitration any accounts, claims, questions or disputes whatsoever which may arise in connection, or in any way relating to, the interest of the Assignor in the Assigned Project Documents and execute any releases or other discharges in relation thereto.

The notion "Assigned Project Documents" is defined in Clause 1.1 as the PSA and the K&K Joint Operating Agreement of 22 April 1999 between SOA, Frontera, Delta/Hess and Salyan Oil Limited.

By a letter dated 29 April 2001 the Bank notified Frontera Resources Caucasus Corporation that certain Events of Default had occurred and were continuing under the Loan Agreements. In a letter of 4 July 2001 the Bank notified Salyan Oil Ltd, although not required to notify according to the Security Assignment, that it was taking enforcement action with respect to the Joint Operating Agreement (JOA) Participating Interest in accordance with Clause 7 of the Security Assignment.

Based on the foregoing the Tribunal finds that the Bank according to the plain language of Clauses 7 and 8.1 (c) and (e) of the Security Assignment was authorised to compromise and release the claims of Frontera relating to the PSA or Local Market Oil, which were assigned to the Bank as security for the obligations of the Borrower under the Loan Agreement.

The disagreement between the Parties concerns the question as to whether Frontera's *disputed* claims were assigned to the Bank. SOCAR contends that they were included in the assignment while Frontera suggests that they were not. Both Parties rely on expert opinions on English law. Frontera relies on legal opinions by Ms Janie Anderson Castle of Davies Arnold and Cooper, London, and Mr Peter Castle of Lincolns Inn, London, and SOCAR on opinions by Mr Simon Browne-Wilkinson QC of Fountain Court Chambers Temple.

Ms Anderson Castle and Mr Castle refer to *Chitty on Contracts* and to the case *Investors Compensation Scheme Ltd v West Bromwich Building Society et al* and explain that the object of construction in English law is to discover the intention of parties, but that this task is approached objectively. Since neither Frontera nor SOCAR has presented any evidence regarding the intention of the Parties when they entered into the contracts in question, the Tribunal holds that it will have to interpret these contracts solely on the basis of the meaning, which the words used in the contracts would convey to a reasonable person having the background knowledge, which would reasonably have been available to the Parties in the situation in which they were at the time of the contracts.

Ms Anderson Castle and Mr Castle go on to say that the Security Assignment, the Notice of Security Assignment, the Deed of Transfer and the Deed of Release should be interpreted together as part of the background in order of executions in order to establish their commercial intent and purpose. Based on the definition of "Assigned Project Documents" and Clauses 8.1 and 3.1 in the Security Assignment as well as Clauses 1, 2, 3 and 6 in the Deed of Transfer they conclude that the assignment and assumption of rights and obligations apply only to rights and obligations arising on or after the date of the Deed. The assignment includes in their view only the contractual interests of the Assignor, and not debts accrued prior to the assignment becoming effective.

Mr Browne-Wilkinson, on the other hand, finds that Frontera's claims were assigned to the Bank by virtue of Clause 2 of the Security Assignment. Clause 3.1 of this document constitutes in his view simply a license for Frontera to exercise the rights under the PSA prior to the Bank exercising its rights pursuant to Clauses 7 and 8 of the Security Assignment. It does not, in his view, reserve to Frontera some category of rights, which are not caught by the assignment.

The key provision in this context is Clause 2 of the Security Assignment. This Clause provides:

> The Assignor [i.e. Frontera], with full title guarantee and as security for the full payment and performance of all the Secured Obligations, assigns, and agrees to assign, absolutely to the Bank, all of the Assignor's right, benefit, title and interest, *present and future* in, to and under the Assigned Project Documents, including *all proceeds in respect of the above and all cash or other property at any time receivable or distributable in respect of the above*, subject always to the terms of the Assigned Project Documents (emphasis by the Tribunal).

In the view of the Tribunal the plain language of this provision makes it abundantly clear that Frontera agreed to assign all proceeds in respect of the Project at any time receivable or distributable. The crucial question is therefore whether the Assignment itself or any of the other documents relating to this assignment contain provisions which modify the plain language of Clause 2 and lend support to Frontera's assertion that Frontera remained entitled to and liable for all rights and obligations accruing under the PSA and the JOA prior to the date when the assignment took effect and that, as a consequence, the assignment did not comprise debts owed to Frontera arising prior to that date.

One provision, which could be interpreted as a modification of Clause 2 is Clause 3.1 of the Security Assignment. This Clause reads as follows:

> Notwithstanding the terms of the assignment set out in Clause 2 (Assignment) the Assignor shall, subject to the terms of the other Financing Agreements, be entitled to exercise and enforce all or any of its rights, discretions and remedies under the Assigned Project Document and any other document relating to, or otherwise in respect of, the assigned Project Documents.

This provision sets forth that Frontera remained entitled to exercise and enforce all its rights in the meantime between the date of the Assignment and the date when the assignment took effect. But it *does not* say that Frontera after the date when the assignment took effect would remain entitled to exercise and enforce accrued outstanding debts owed to Frontera relating to the period prior to the date of the assignment or any claims owned by Frontera and arising prior to this date. Any other interpretation of this provision would negate the effect of the security assignment as set out in Clause 2. Thus, Clause 3.1 does not contradict or modify Clause 2.

A further provision which could be interpreted as a modification of Clause 2 is Clause 6 (c) of the Deed of Release. This provision stipulates *i.a.* that the final settlement of the LMO Dispute shall not place any of the Frontera companies in a worse financial situation than if the final settlement had provided that Frontera is not under any obligation to pay any sum to Delta/Hess, SOA or SOCAR. Particularly when read together with the third sentence of Clause 6 (c) it is obvious that this provision protects Frontera from any obligation to pay further damages but does not deal with Frontera's *claims* against SOCAR. Consequently, none of these clauses modifies Clause 2 of the Security Assignment.

Ms Anderson Castle and Mr Castle argue that the Assignment be read and interpreted together with the Enforcement Notice, the Deed of Transfer and the July 2002 Protocol, since the Bank drafted these agreements.

The Tribunal agrees with Frontera's legal experts that the three documents signed subsequently to the Assignment could shed light on the Bank's intentions. The Enforcement Notice of 4 July 2001 states that the Bank took enforcement action with respect to the JOA Participating Interest in accordance with the Security Assignment, and as a consequence thereof the Bank should be entitled, as of the date of the transfer, to be treated as the only person entitled to exercise and enforce all rights, discretions and remedies relating to Frontera's JOA Participating Interests (and the corresponding PSA Participating Interests) to the exclusion of Frontera, as if the Bank were to be a party to the JOA in place of Frontera. The Deed of Release of 21 April 2002 contains similar language in the preamble, paragraphs (F) and (G). These provisions are fully consistent with the Tribunal's interpretation of the Clauses in the Security Assignment. Thus, they do not modify or amend the clear language of the Security Assignment.

Ms Anderson Castle and Mr Castle further argue that Clauses 1, 2, 3, and 6 of the Deed of Transfer, when read together, expressly provide that the assignment and "assumption apply only to rights and obligations arising 'on or after the date' of the Deed". However, in the view of the Tribunal this is not what these provisions say. These provisions prescribe that Frontera transfer and the Bank assume all the rights, interests, obligations and liabilities of Frontera "with effect from (and including) the date of the Deed". It does not, however, distinguish between past and future rights and interests. The words "arising on or

after the date of this Deed" refer only to the Bank's agreement to assume and perform Frontera's *obligations*.

Frontera's legal experts also argue that it is a general principle of English law that the scope of property included within an assignment depends on the language used in the document. Thus in the absence of specific words including accrued debts such accrued debts will not be included. As an example of this principle they refer to assignment of shares in the context of accrued but unpaid dividends. They contend that in the absence of an express provision, including in the property transferred declared but yet unpaid dividends, such dividends do not pass with the shares to the transferee. In support of this contention they refer to one case *viz. Re Kidner* 1929 2 Ch 121 at 126. This case regards an assignment of shares and debentures according to a contract. It appears from the opinion of Eve J. in this case that the judge decided the case on the basis of an interpretation of clauses 6 and 7 of that contract. Thus, this case does not seem to support the contention of the experts that it expresses a general principle of English law.

The experts further contend that an intent by the Bank to take the accrued debts involved in the dispute would be inconsistent with the commercial prudence of financial institutions generally not to "buy" or become involved in lawsuits. The Tribunal believes that this observation is correct. However, speculations about the intentions of banks generally cannot override the clear language of the contracts concerned.

Consequently, the Tribunal holds that the meaning which these documents convey to a reasonable person having all the relevant background knowledge, which would reasonably have been available to the Parties in the situation in which they were at the time of the signing of the Security Assignment, is as follows: the assignment to the Bank comprised all accrued debts owed to Frontera that were outstanding at the time when the Security Assignment became enforceable, but not accrued debts, which Frontera had collected in the meantime between the execution of the Security Assignment and the date when the Security Assignment became enforceable.

### 5.2.2 Did the Bank have any rights to Frontera's assigned rights subsequent to the date when the Bank had concluded its involvement in the PSA?

In case the Tribunal would find that any of Frontera's rights have been assigned to the Bank, Frontera argues that:

(i)    No assignment of rights exclusive of Frontera's rights to pursue the claims existed subsequent to the date when the Bank had concluded its involvement in the PSA on 7 March 2002. From that date the Security Assignment was no longer in force. When the Bank concluded its interests in Frontera, the Bank specifically recognized that Frontera continued to have claims against SOCAR.

(ii)   Frontera and the Bank also specifically recognized that their agreement did not give any rights to any entities, such as SOCAR, who were not parties to the Bank agreement.

(iii)  A significant portion of Frontera's claim is not encompassed by the LMO Dispute as defined by the Bank.

SOCAR denies that the Bank concluded its involvement in the PSA on 7 March 2002. According to SOCAR the transaction was not concluded until 4 July 2002, since it could not be completed until SOCAR had approved the transfer. This was done on 4 July 2002.

It is an undisputed fact that the transactions of sale and purchase between the Bank, CNODC and FAL were completed on 7 March 2002 and that the consideration received by the Bank from the Chinese companies exceeded the aggregate amount owing by the Borrower to the Bank, see paragraphs (J) and (K) in the preamble of the Deed of Release. The Security Assignment defines the Release Date as the date on which the Secured Obligations have been irrevocably paid, performed and discharged in full. The Security Assignment also contains the following provisions in items 6.1 and 21:

6.1   The security constituted by this Assignment shall be continuing and will extend to the ultimate balance of all the Secured Obligations regardless of any intermediate payment of discharge in whole or in part.

21.   This Assignment shall continue in force until the Release Date. On the Release Date, the Bank shall forthwith----execute and do all such assurances as may be necessary to release the Assigned Project Documents

from the security constituted by this Assignment and reassign and retransfer the Assigned Project Documents to the Assignor.

According to paragraphs (M) and (N) of the Deed of Release the Bank had indemnified each of CNODC and FAL – as part of the transactions of sale and purchase – against all losses, damages, costs and expenses, which they may suffer as a result of or arising from Frontera's obligations and liabilities, and the Bank had created a provision to cover its contingent liability to the purchasers arising from this indemnification. Consequently, the Bank had also after 7 March 2002 a continuing interest in the settlement of the disputes among SOCAR, SOA and Delta/Hess relating to deliveries of, and payment for, LMO. For this reason the Tribunal holds that the Bank's entitlement under the Security Assignment to settle the LMO Dispute continued also after that date. The July 2002 Protocol, according to which the Bank finally settled the dispute, contains mutual concessions by the Parties to it. Thus, as contended by SOCAR, the Bank did not conclude the transaction until 4 July 2002, when SOCAR together with SOA and Delta/Hess signed the Protocol. There is no evidence that the Bank and Frontera, despite the settlement, specifically recognized that Frontera continued to have claims against SOCAR.

### 5.2.3 Did Frontera and the Bank specifically recognize that their agreement did not give any right to parties who were not a party to the Bank agreement?

Frontera relies in support of this assertion on a provision in item 8 of the Deed of Release which reads:

> A person who is not a party to this Deed (------) shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

SOCAR contests this assertion.

The Contracts Act 1999 relates to the situation when a third party attempts to enforce a term of a contract *in his own right*. Article 8 of the Deed of Release excludes a third party from the right to rely on the provisions of this Act. However, SOCAR does not attempt to enforce the terms of the Deed in its own right. SOCAR is simply referring to item 6 (c) of the Deed in support of its contention that the Bank was authorised under the contracts between the Bank and the Frontera companies to settle the LMO Dispute. Thus, this provision

does not support Frontera's assertion that Frontera and the Bank recognized that their agreement did not give any right to the parties who were not a party to the agreement with the Bank.

### 5.2.4 Does a significant portion of Frontera's claims fall outside the term LMO Dispute?

Frontera contends that the term "LMO Dispute" in the Deed of Release includes only Claim A. SOCAR, on the other hand, asserts that the Deed refers to and deals with the dispute between SOCAR and the Contractor and Frontera's position with respect to that dispute. In that regard it deals, according to SOCAR's view, with both Claims A. and B. "and also with any basis for asserting Claim C.".

The relevant provision is to be found in paragraph (L) of the preamble of the Deed of Release. This provision reads in its entirety:

> At the date of this Deed there are outstanding disputes among SOCAR, SOA, the Bank (pursuant to its rights under the Security Agreements) and Delta Hess relating to deliveries of, and payment for, Local Market Oil (as defined in the K&K PSC) during 1999 and 2000, when Frontera Azerbaijan was still a party to the K&K PSC (the LMO Dispute).

Frontera pleads that the phrase "deliveries of Local Market Oil" relates only to Frontera's claim that SOCAR failed to pay for LMO deliveries in the last quarter of 1999 and the first quarter of 2000. Frontera holds the view that it did not make any LMO deliveries to SOCAR in November and December 2000, since SOCAR seized the oil that Frontera had available at that time, giving rise to Claim B., and valued the oil at the netback price, not the LMO price. This view is according to Frontera consistent with the language used by SOCAR and the Bank in the July 2002 Protocol whereby the Bank and SOCAR distinguished between "(a) Local Market Oil deliveries from 1st November 1999 to 1st April 2000 and (b) deliveries of Crude Oil to SOCAR during December 2000".

The Tribunal draws the following conclusions on this issue. The Bank's authority to settle Frontera's claims according to the Security Assignment is elaborated further in item 6 (c) of the Deed of Release. This provision refers expressly to the "LMO Dispute". The definition of this term in the Deed is far from clear. Both Frontera's and SOCAR's interpretation is reasonable in view of the circumstances of the case. The evidence shows that the Bank formulated the

text of the Deed. The Tribunal holds that in such a case any ambiguous text should be interpreted in favour of Frontera (*Chitty on Contracts, vol. I, 29th edit. para 12–083*). Furthermore, the language of the July 2002 Protocol supports this view. The only *delivery* of oil that took place during December 2000 was the 9,000 tons remaining in storage at the date of the December 2000 Protocol, which the Contractor Parties undertook to deliver to SOCAR according to the Protocol. The rest was simply seized by SOCAR. The interpretation contended by Frontera is consistent with item 2.2 (b) of the July 2002 Protocol, which refers to deliveries of Crude Oil in *December 2000*, although SOCAR halted all exports already in mid-November 2000. Frontera's Claim B. comprises also about USD 410,000 for oil seized by SOCAR during November. Had the Bank intended to include this claim in the settlement, a correct formulation would have been Crude Oil delivered "during *November and* December 2000". Thus, the Tribunal finds that the Bank had no authority to compromise Claims B. and C.

### 5.2.5 Did the Bank compromise Frontera's Claim A. through the July 2002 Protocol?

Frontera contends that the language of the July 2002 Protocol is not sufficient to constitute a release of Frontera's claims and submits the following argument in support of this view: Under item 2.2 of the Protocol the Bank, Delta/Hess and SOA accepted "that SOCAR is deemed to have met all of its obligations with respect to payment for Local Market Oil under the REDPSA during the period 1st November 1999 to 1st December 2000". The Protocol constituted an artificial "deeming" that SOCAR had met all its obligations under the PSA in order to preclude the new parties to the PSA from invoking Article 14.4 to refuse to deliver LMO to SOCAR. The Bank did not release Frontera's claims, any more than Delta/Hess or SOA could be shown to have released Frontera's claims for payment. Instead, the Bank and SOCAR structured the July 2002 Protocol in such a way that from that day forward, the Parties to the PSA would conduct themselves in accordance with the PSA as if SOCAR had paid for all deliveries of oil in the past. Therefore, the Parties' choice of the word "deemed" instead of "release" demonstrates that the Parties recognized that SOCAR had not paid for the oil in the past but would not be required to make the payment under article 14 of the PSA in order to proceed with deliveries under the PSA from the date

of the sale by the Bank to CNODC and forward. SOCAR had to have this "deeming" language because the Protocol specifically terminated the December 2000 Protocol, which had permitted the delivery of local market volumes even though SOCAR had not paid the initial shipments of oil in 1999 and 2000. – The July 2002 Protocol used the following language as to SOCAR's claims: "SOCAR agrees to make no further claim with respect to payment from the Original Contractor Parties, EBDR and/or the Contractor Parties for amounts of Crude Oil exported from the Contract Area during the period 1st April to 1st December 2000". The Original Contractor Parties are defined to mean SOA, Frontera and Delta/Hess. In the parallel statement in item 2.2 pertaining to claims against SOCAR the words "Original Contractor Parties" are omitted from any agreement to make no further claim. Nor is Frontera specifically named.

Frontera's interpretation of the word "deemed" as opposed to "release" does not convince the Tribunal. In the view of the Tribunal Frontera's interpretation of the July 2002 Protocol and the "deeming language" therein is not consistent with paragraph (i) of the introductory provision of the Protocol, since the paragraph provides that the parties to the Protocol agree to "enter into this Protocol, *inter alia,* as a **final settlement** of their differences in respect of the 1999/2000 LMO Dispute" (emphasis by the Tribunal). As to Frontera's argument that the text of item 2.2 does not include Frontera, the Tribunal simply notes that the text enumerates EBRD (the Bank) among the Parties to the July 2002 Protocol, and that it follows from the first paragraph of the introductory part of the Protocol that the Bank acted on behalf of *i.a.* Frontera pursuant to its rights under the Security Assignment.

Consequently, Claim A. but not Claims B. and C. was resolved by the July 2002 Protocol.

### 5.2.6 Was Frontera entitled to invoke Article 14.4 of the PSA as from 1 April 2000?

*The Parties' contentions*

**Frontera** contends that the company was entitled under Article 14.4 of the PSA to cease delivery of LMO on 1 April 2000 because payment for LMO delivered to SOCAR remained unpaid for two quarters at the end of March 2000.

SOCAR objects to this interpretation of the PSA for the following reasons:

(i)    SOCAR received oil from Frontera for the period 15 November – 31 December 1999 and for the first quarter of 2000 but did not have to pay for it at this time.

(ii)   No invoice had yet been received.

(iii)  No payment mechanism is contained in the PSA. Payment is not even possible until the accounting procedures according to the PSA in terms of valuation of the oil have been complied with, cost of oil identified and the price of oil delivered had been so determined. No such accounting was done at this time by Salyan Oil Ltd, no price was determined and no calculation was made of the part of Frontera's production, which was to be sold back to SOCAR pursuant to Article 14.1 (b) of the PSA.

(iv)   In any case Frontera had not acquired any right to cease delivery of LMO by 1 March 2000 because at the end of April only one quarter would have passed. The payment for oil deliveries of LMO in November and December 1999 and the first quarter of 2000 did not fall due until July 2000 at the earliest.

*The Tribunal's conclusions*

The Tribunal concludes from the statements of both Parties that Frontera during 1999 and the first quarter 2000 delivered the entire production of oil as LMO to SOCAR. The evidence shows that there was no disagreement between the Parties as to the amount of oil delivered to SOCAR during this period, since representative of both Parties monitored the deliveries at the agreed point of delivery and recorded the amount of oil delivered. Pursuant to Article 14.1 (b) the Government Authorities of the Republic of Azerbaijan established the price of crude oil for the local market. In these circumstances there was no need to apply the accounting procedure in the PSA. The PSA does not contain any specific provisions regarding invoicing. Consequently, the Tribunal finds that SOCAR did not have any valid reason to avoid payment because of the reasons suggested by SOCAR under item (ii) or (iii) above.

Article 14.4 provides that Frontera was entitled to cease sales of LMO to SOCAR pursuant to Article 14.1 (b), if any amount payable by SOCAR re-

mained unpaid "for two (2) consecutive Calendar Quarters". In the view of the Tribunal this provision is ambiguous in certain respects. The Tribunal notes first that the PSA does not say when payments for LMO fall due. Secondly, it is an undisputed fact that Frontera did not commence deliveries of LMO until mid-November 1999 *i.a.* when about one and a half months of the quarter had already elapsed. The term "Calendar Quarter" is defined in Appendix 1 for the purposes of the PSA as "a period of three (3) consecutive months commencing on the 1st of January, the 1st of April, the 1st of July, or the 1st of October in any Calendar Year". Thus, payment for two full Calendar Quarters did not remain unpaid on 1 April 2000. Consequently, the Tribunal holds that Article 14.4 was not applicable on 1 April 2000.

### 5.2.7 The February 2000 agreement

*The Parties' contentions*

Frontera refers to the discussions with Mr Aliyev at the meeting on 10 February 2000 at SOCAR's office in Baku in support of its contention that Frontera was entitled to invoke Article 14.4 as from 1 April 2000. However, the Parties have presented irreconcilable assertions about the outcome of the 10 February meeting. Frontera's version is based on Mr Nicandros' testimony and SOCAR's on Mr Aliyev's.

Frontera contends that (i) Mr Nicandros demanded payment of SOCAR's debt for LMO delivered during the last quarter of 1999 and the first quarter of 2000, (ii) that he, based on Mr Aliyev's statements and SOCAR's previous record, was convinced that SOCAR did not intend to pay this debt prior to 1 April 2000, (iii) that Mr Aliyev admitted that Article 14.4 in such a case would be applicable, and (iv) that Mr Aliyev signed the letter of 10 February 2000 in order to confirm Frontera's right to export.

SOCAR, on the other hand, submits the following assertions about the meeting: The purpose of the meeting and the subject of Mr Nicandros' discussions were to persuade Mr Aliyev to permit Frontera to stop delivery of LMO and to commence export at the beginning of April 2000. Mr Nicandros wanted to achieve two aims at the meeting. Firstly, he wanted to have an agreement that Frontera could export LMO and, secondly, he wanted confirmation that although SOCAR had not received its full entitlement to LMO for the relevant

period, SOCAR would waive this entitlement. Mr Nicandros stated that the level of production was lower than anticipated and thus Frontera did not achieve the revenues to fund the project. He explained that Frontera's financial situation was difficult as a result of this situation. Mr Aliyev agreed to allow Frontera to export LMO as from the 1 April 2000 in order to alleviate the financial pressure, which Frontera was experiencing. He explained that SOCAR was unable to allow Frontera to start export earlier, since Azerbaijan needed the LMO during the winter season. He also explained that the Republic of Azerbaijan at the relevant time was short of funds because it had to care for a great number of refugees from adjacent republics. Thus, the agreement would also assist the Republic of Azerbaijan as SOCAR would not have to pay in cash for the LMO which had been delivered as Frontera could recover funds from the additional revenue Frontera would achieve by exporting. The tenor of the meeting was of to parties to a commercial contract discussing a problem with a view to finding a solution, which they could both live with. It was not a meeting at which one party demanded its legal rights. (See Aliyev, Transcript 9 March pp. 105-112.)

Frontera relies on a number of statements by SOCAR and Mr Aliyev to support the contention that SOCAR agreed that Frontera and the Contractor Parties would be free to export LMO from 1 April 2000 according to Article 14.4 and not, as asserted by SOCAR, merely as a result of a concession by Mr Aliyev (SOCAR's submission 25 November 2004 p. 4, Aliyev affidavit 10 March 2005 p. 26, Aliyev testimony 9 March 2005, pp. 106–107, pp. 108–109, p. 120, p. 149, Hearing transcript 7 March 2005 p. 50 and p. 180). Frontera also argues that the PSA does not contain any provision, which allows SOCAR to set off Frontera's claims.

*The Tribunal's conclusions*

The following circumstantial evidence support SOCAR's version rather than Frontera's:

1.  The circumstances suggest that Frontera had miscalculated the initial production capacity of the oil wells, which resulted in zero cash flow and financial difficulties for Frontera, since Frontera had to deliver the entire production of oil as LMO during the last quarter of 1999 and the first

quarter of 2000. Frontera suggests that the Force Majeure provision in the PSA is applicable and that the low production was due to SOCAR's mismanagement of the wells in the period between the effective date of the PSA and mid-November 2000 when Frontera in actual fact took over the wells. However, this question is of no relevance in the case in view of SOCAR's acknowledgement in the February 2000 letter that the shareholders of Salyan Oil Ltd had fulfilled their obligation to deliver under Article 14 of the PSA.

2.  The Contractor Parties attempted already at the Steering Committee meeting in December 1999 and in a letter of 15 January 2000 to persuade SOCAR to waive the LMO entitlement. Thus, Frontera's request at the February 2000 meeting was not, as contended by Mr Nicandros, entirely caused by the fact that SOCAR had not yet paid for the LMO deliveries. (See Minutes from this meeting of the Steering Committee.)

3.  The wording in the letter dated 10 February 2000 does not support Mr Nicandros' version of the meeting. It does not convey the impression that Frontera was demanding to be able to exercise its contractual rights under Article 14.4 of the PSA. Mr Nicandros states in the letter that

> "(b)ased on our discussion, we are now commencing preparations for the export of oil on April 1st and I wish to thank you for your kind consideration in this regard. -----I believe that SOCAR, Delta-Hess and Frontera would all greatly benefit from this action".

The letter contains no express reference to Article 14.4 and it does not mention that the Contractor Parties would commence export of oil from 1 April, on the assumption that SOCAR would not pay for the oil delivered before that date. On the contrary, the wording of the letter fits very well with Mr Aliyev's version that he and Mr Nicandros attempted to agree on a solution that would alleviate both Frontera's and SOCAR's problems as submitted by SOCAR in its assertions about the February 2000 meeting. The Tribunal is not convinced by Mr Nicandros' explanation that he formulated the letter in this way simply out of courtesy to Mr Aliyev.

4.  Mr Nicandros testified that he wanted an immediate permission to commence export of oil from 1 April 2000 according to Article 14.4 of the PSA, because Frontera intended to conclude agreements with purchasers of the

oil and carriers already prior to that date. If the export of LMO was to take place according to Article 14.4, Frontera could not know on 10 February 2000 whether this would be possible, since Frontera had to consider the possibility that SOCAR might pay for the oil delivered from 15 November to the end of 1999 before 31 March 2000. Thus, payment for two Calendar Quarters would not be outstanding at the end of March 2000 even according to Frontera's interpretation of this article. Mr Aliyev stated in his testimony that SOCAR would have been able to allocate sufficient funds for this purpose, despite the Republic's financial strains. (Transcript 9 March p. 165, lines 15–25)

5.   The management of Frontera discussed whether to include in the letter a time limit for the entitlement to export LMO. (See Transcript 8 March pp. 114 to 115 line 9.) This discussion had been completely superfluous in case the letter dealt with Frontera's right to cease delivery of LMO under Article 14.4, since this article specifies in clear language under which circumstances Frontera had to resume delivery of LMO to SOCAR.

6.   On 25 March 2000 Mr Nicandros sent an e-mail to Mr Yukler of Salyan Oil and Mr Reggie Spiller instructing Salyan Oil not to request payment for the LMO delivered up to 31 March 2000. The e-mail states:

> "On another note as we have discussed, we need to be careful that this issue of LMO is handled delicately going forward in that we want to make sure we have suspension of the LMO, Salyan should not send any bills for past due payments. Are we in agreement?"

This e-mail contradicts Mr Nicandros' statement that Frontera was desperate for payment of SOCAR's debt and that the primary aim of the February 2000 meeting was to demand payment of this debt.

Not a single word of the statements by SOCAR and Mr Aliyev, which Frontera relies on in support of its assertion that SOCAR consented to Frontera's export of oil according to Article 14.4 of the PSA, contains any reference to this article or to the circumstances mentioned therein. The statements prove that SOCAR conceded to Frontera's export of LMO after 1 April 2000, but this concession is by no means inconsistent with SOCAR's version of the outcome of the 10 February 2000 meeting.

In reply to Frontera's argument that the PSA does not permit SOCAR to set off Frontera's claim for oil deliveries, SOCAR contends that the PSA does not, and could not, regulate all conceivable situations, some of them difficult to predict. The Tribunal notes that the PSA leaves a number of details open as to SOCAR's obligation to pay for the LMO. Firstly, it does not specify when the payments fall due. Secondly, Article 14.1 (b) provides that the Parties shall agree on the currency in which the payments shall be made. These gaps in the PSA were not filled in until the conclusion of the December 2000 Protocol. Thus, an agreement that SOCAR was entitled to set off its debt against Frontera's Claim A. did not constitute any amendment to the PSA. Further, since the PSA left to the Parties to agree on the currency, the Tribunal holds that the Parties were also free to agree that payment could be made by means of a set-off.

Consequently, based on the circumstantial evidence, the Tribunal holds that Mr Nicandros on behalf of Frontera and Mr Aliyev on behalf of SOCAR on 10 February 2000 agreed that (i) Frontera was deemed to have met its LMO obligations in 1999 and the first part of 2000; (ii) that SOCAR voluntarily waived its right to LMO entitlement as from 1 April 2000, not because Article 14.4 of the PSA came into operation but as a mutually satisfactory solution to the problems of both Parties and (iii) that SOCAR would be entitled to set off SOCAR's debt for LMO delivered in the last quarter of 1999 and the first quarter of 2000 against Frontera's excess profit from the export of the oil. Mr Aliyev signed Mr Nicandros' letter of the same date to confirm this agreement.

It is not clear when this letter was signed by Mr Aliyev. Mr Nicandros could not recall whether he had handed over the letter at the meeting or whether it had been delivered subsequently. Mr Aliyev on the other hand had a clear recollection that Mr Nicandros brought the letter to the meeting, that he signed it at the end of the meeting and that the meeting was preceded by a meeting between Mr Nicandros, Mr Yusiphzahdh of SOCAR and Mr Aleskerov. Mr Aleskerov denies a statement by Mr Nicandros that Mr Aleskerov at a prior meeting had confirmed that as of the end of March 2000 the Contractors were entitled to halt deliveries of LMO to SOCAR. Thus, Mr Nicandros should have been aware that SOCAR was likely to refuse to admit that Article 14.4 would be applicable on 1 April 2000 when he met with Mr Aliyev. Irrespective of when

Mr Aliyev signed the letter of 10 February 2000, the letter does not contradict Mr Aliyev's version of the agreement.

It is undisputed that the 10 February 2000 agreement does not include any time limit within which the agreement would be valid. Since the agreement mainly contains important concessions by SOCAR, it is reasonable to regard that it would continue to be in force until further notice by SOCAR (Transcript 8 March p. 115, lines 2–9). From May to October 2000 SOCAR communicated and wrote to Frontera seeking a resolution of the LMO issue. Frontera did not cease export of LMO. The only remedy available to SOCAR under the PSA, if Frontera refused to comply with its LMO obligation, was to terminate the PSA with respect to the Contract Rehabilitation Area in accordance with Article 14.2 (b) of the PSA and pursuant to the procedure and terms set out in Article 32.1 (a), giving Frontera a period of ninety days to cure the situation. The Tribunal holds that SOCAR's measure to instruct the Azeri Customs Authorities simply to stop Frontera's export of oil was an extra-contractual measure that was not allowed under the PSA. SOCAR had only two alternatives that would be consistent with its contractual obligations: either to give Frontera a written notice that it wanted to terminate the PSA or to negotiate an agreement with Frontera specifying the terms under which Frontera was willing to resume LMO deliveries. SOCAR and Frontera made such a deal in the December 2000 Protocol, which sets out Frontera's obligation to deliver LMO with effect from 1 January 2001 and fills in the gaps in the PSA regarding the details of SOCAR's payment obligation. Consequently, the Tribunal holds that the February 2000 agreement continued to be in force until 1 January 2001. At the same time item 7 of the Protocol does not deprive Frontera of its right to seek redress for past or future breaches of contract. For the reasons stated the Tribunal finds that Frontera is entitled to compensation for the oil seized by SOCAR in November and December 2000 subject to the reduction of Claim B. referred to in Section 6.

### 5.2.8 Are the December 2000 and the July 2002 Protocols binding documents?

Frontera first argues that the failure of all necessary parties to join the December 2000 Protocol and the lack of evidence by execution of the Protocol makes it non-binding and null and void *ab initio*. Frontera contends that under English

law, where a transaction is entered into and the contract is executed by a party on the known expectation or assumption that it will be executed by the other parties, then in the absence of the execution by one of the other parties, the effect of which would make the transaction different from that into which it was the intention to enter, the transaction will be null and void. In support of this argument Frontera relies on three English cases: *Woollam v Barclays Bank plc* 1988 EGC 22, *Lady Naas v Westminster Bank Ltd* 1940 A.C.366 and *Greer v Kettle* A.C. 156.

The Tribunal first notes that it is questionable whether English law is at all applicable to the December 2000 Protocol. The Protocol does not contain any express choice of law provision. The agreement reflected in the Protocol was entered into in Azerbaijan and it contains essentially obligations that would be performed in Azerbaijan. Thus, the choice of law provisions, which the Tribunal finds applicable to the substance of the December 2000 Protocol, point rather to Azeri law as the applicable law. SOCAR has not provided any evidence regarding Azeri law. Be it as it may, the Tribunal holds that English law reflects a generally accepted principle of contract law, which is also applied by courts in countries with a developed legal system. The principle is this: If it is a known condition precedent for a party, who enters into a contract, that another party accepts to undertake an obligation under that contract, and the absence of such an undertaking would make the transaction different from that into which it was his intention to enter, then the transaction will not be binding on the first party, if it can be proved that the condition fails. In *Woollam*, which refers to *Lady Naas* and *Greer*, it was established that Mrs Woollam refused to sign the charge. In the present case there is no evidence that Delta/Hess or SOA eventually refused to accept the conditions laid down in the Protocol, although their signatures are missing. On the contrary, the July 2002 Protocol, which is executed by Delta/Hess and SOA, states in paragraph (d) of the preamble as a matter of fact that "SOCAR and the Original Contractor Parties entered into a Protocol dated 29th December 2000", and a copy of this Protocol is attached to the July 2002 Protocol as an Appendix. Thus, if it was a condition precedent for Frontera that SOA and Delta/Hess accepted the conditions laid down in the December 2000 Protocol, this condition did not fail.

Frontera also contends that the December 2000 Protocol is voidable because it was entered into under economic and non-economic duress. Both Parties have submitted legal opinions on the matter of duress under English and Azeri law.

The Tribunal does not question Frontera's assertion that the company found itself in a very cumbersome situation towards the end of the year 2000. The storage capacity in the available tank farms was being exhausted as a result of SOCAR's measure to instruct the Customs Authorities to stop Frontera's export of oil. Frontera faced a situation in which the company would have to close the oil wells with far-reaching economic consequences for Frontera and that this situation was a significant cause for Frontera to enter into the Protocol. According to a legal opinion by Mr Peter Castle and Ms Janie Anderson Castle the basis of duress under English law depends on the combination of pressure and presence of practical choice. The pressure must be illegitimate which means that there is a certain room for economic pressure in normal commercial negotiations that does not fall under the concept of duress (*DSDN Subsea Limited v Petroleum Geo Services ASA and anor.* 2000 B.L.R. 530). It is not necessary that the duress deprives a party of all choice but it has to present him with a choice of evils (*Chitty on Contracts 29th edit. Vol. 1, paragraph 7-004* ). The opinion states, without any reference to sources of law or authorities, that a threat to seize or detain goods wrongfully and a threat to breach a contract are capable of constituting duress. When deciding whether the pressure asserted by SOCAR was illegitimate the Tribunal considers the following circumstances:

1. SOCAR's measure to stop the export of oil constituted a breach of contract and is tantamount to a detention of goods. However, it should be taken into account that Frontera at the same time was in breach of the agreement of 10 February 2000, since Frontera refused to accept that SOCAR according to that agreement was entitled to set off its debt against Frontera's excess profit on the export of LMO.

2. Frontera still had the possibility to solve the situation and resume deliveries of LMO and subsequently refer the matter of damages for breach of contract to arbitration. The Parties are in agreement that the contract under the applicable law is voidable, if not null and void. This means that a person who has entered into a contract under duress may either affirm or avoid the

contract after the duress has ceased to operate. It is therefore an important question, so far as avoidance of the contract procured by duress is concerned, to identify when the duress ceased to operate. Where the opportunity to return to the original position is no longer an available practical proposition so that restitution is not possible, then English Law provides for an account of profits and restitution of benefits (Legal Opinion by Janie Anderson Castle and Peter Castle 19 October 2004, p. 20). The Tribunal does not find that Frontera has presented convincing evidence that Frontera or any of its officers was subject to physical threat. Thus, the threat was of economic nature, caused by SOCAR's measure to stop the export of oil and the resulting lack of storage capacity. However, this "duress" ceased to operate when Frontera had signed the December 2000 Protocol, which in fact reinstated the original position of the Parties under the PSA, but Frontera did not take any action to avoid the Protocol until it initiated the present arbitration. The Tribunal does not accept Frontera's contention that it did not have any opportunity to move forward with arbitration against SOCAR pending the transfer of its interest to the Bank, in view of the fact that more than six months elapsed between the signing of the December 2000 Protocol and the Enforcement Notice in July 2001.

The Tribunal concludes that the December 2000 Protocol is a binding contract.

The Tribunal cannot find that the July 2002 Protocol was entered into under duress any more than the December 2000 Protocol.

### 5.2.9 Unjust enrichment

Frontera contends that SOCAR would be unjustly enriched if, as a result of the July 2002 Protocol, SOCAR is found to be released from the obligation to pay any amount, which it would otherwise owe Frontera. According to Frontera's contention SOCAR did not pay anything of substance in return for such release. Frontera asserts that SOCAR only gave its consent to the Bank's transfer of the Frontera Participating Interests to CNODC, a consent that SOCAR was already prohibited from unreasonably withholding according to Article 25.2 (b) (iii) of the PSA, and SOCAR therefore received a benefit without paying or otherwise compensating Frontera, or anyone else, for it. Frontera contends further that to the extent the Tribunal would find Frontera's claims justified as such but hold

Frontera disqualified from raising them against SOCAR, because of the transactions between Frontera, the Bank and/or SOCAR during the period 14 November 2000 – 4 July 2002, then the Tribunal in the alternative should award in favour of Frontera an amount corresponding to the justified part or parts of Frontera's claims. Frontera asserts that there is support for this legal ground in English as well as in Azeri and Alberta Law that would enable Frontera to avoid the effect of the release.

SOCAR denies that the principles of unjust enrichment are applicable in this case. In this respect SOCAR relies on a legal opinion by Mr Simon Browne-Wilkinson. As to Azeri Law SOCAR relies on a legal opinion by Mr. Farrukh Gassimov in which he contends that Azeri Law prescribes a two year limitation on presentation of such a claim and that, consequently, Frontera has failed to present its claim for unjust enrichment in time.

The Tribunal finds that the agreements and transactions between Frontera, the Bank and/or SOCAR from 14 November 2000 to 4 July 2002 were the result of normal negotiations regarding the interpretation of contracts, the aim of which was to solve a difficult situation caused by the dispute concerning the contractual relationship between the Parties. In such circumstances the principles of unjust enrichment is of no relevance. To the extent Azeri Law is applicable the Tribunal also finds, based on the legal opinion of Mr Gassimov, that Frontera's claim for unjust enrichment is time-barred.

## 6.  SUMMARY OF THE TRIBUNAL'S CONCLUSIONS

1.  The Bank compromised Frontera's Claim A. with binding effect for Frontera. Consequently, this claim fails (sections 5.1.1 to 5.2.6 above).

2.  The December 2000 Protocol and the July 2002 Protocol are valid documents which bind Frontera (section 5.2.8).

3.  The February 2000 agreement entitled Frontera to export LMO from 1 April 2000. This agreement remained in force until 31 December 2000. Thus, Frontera is entitled to compensation for the volume of the shipments wrongfully seized in the fall of 2000 by SOCAR (section 5.2.7). The Tribunal accepts Frontera's calculation of Claim B. However, the December 2000

Protocol provides that the Contractor Parties shall deliver to SOCAR 9,000 tons of Crude Oil remaining in storage at the date of the Protocol. Frontera admits that this quantity of oil according to the Protocol had to be delivered free of charge (see **Attachment 2** p. 2). Frontera's Claim B. in the amount of USD 1,968,709 shall be reduced proportionally as follows:

Total amount of oil taken by SOCAR without payment during the period 15 November – 31 December 2000 according to Frontera's own calculations = 24,344 tons (see **Attachment 3** p. 1). Frontera's share thereof = 60%.

24,344–9,000   =   15,344 tons
60% of 15,344  =    9,206 tons
60% of 24,344  =   14,606 tons


$$\frac{1,968,709 \times 9,206}{14,606} = USD\,1,240,784$$

4.  Frontera's entitlement to export LMO came to an end on 1 January 2001 and as a consequence hereof Frontera's Claim C. must fail (section 5.2.7).

5.  SOCAR submits its counterclaim only in case the Tribunal concludes that the July 2002 Protocol is not a valid agreement. The Tribunal holds that this Protocol is valid. Consequently, the counterclaim fails (section 4.2).


# 7.  INTEREST

Appendix 6 of the PSA sets out that in the event that monetary damages are awarded, the award shall include interest from the date of the breach or other violation to the date when the award is paid in full. The rate of interest shall be LIBOR plus four percent from the date of the breach or other violation to the date when the award is paid in full.

The Tribunal holds that Frontera is entitled to interest in accordance with this provision from 1 January 2001 as claimed by Frontera. In its claim for interest Frontera has compounded the interest on Claim B. annually through 31 March 2005. There is a clear tendency in international jurisprudence to award only simple interest. (See James Crawford, Special Rapporteur, *Third*

*Report on State Responsibility, International Law Commission, 52nd Sess., 22 U.N. Doc. A/CN.4/507 (2000) at para 208. See also George H. Aldrich, The Jurisprudence of the Iran-United States Claims Tribunal at p. 477–478.*) Against this background the Arbitral Tribunal does not find that the wording of Appendix 6 entitles the Tribunal to award compound interest.

## 8.  COSTS

The arbitration agreement sets forth in Appendix 6 of the PSA the following as to the costs of the arbitration. Each Party shall pay the costs of its own arbitrator. The costs of the third arbitrator as well as any cost imposed by the UNCITRAL Rules shall be paid in equal shares by the Parties. The arbitrators may award costs (including reasonable legal fees) to the prevailing Party from the losing Party. The UNCITRAL Rules provide that the Arbitral Tribunal shall fix the costs of arbitration in the Award. Such costs shall include: (i) The fees of the Arbitral Tribunal to be stated separately as to each arbitrator and to be fixed by the Tribunal itself. The fees shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject-matter, the time spent by the arbitrators and any other relevant circumstances in the case. (ii) The travel and other expenses incurred by the arbitrators. (iii) The costs of expert advice and of other assistance required by the Tribunal. According to Swedish tax law the law firms of Bengt G. Nilsson and Kaj Hobér are required to pay 25% value added tax (VAT) on all fees and compensations for incurred costs. Parties who are not subject to VAT taxation in Sweden are entitled to reimbursement of Swedish VAT upon application to the Swedish tax authorities.

In accordance with the principles laid down in the UNCITRAL Rules the Arbitral Tribunal determines as follows as to the fees of the arbitrators:

|                        | Fees, SEK    | VAT, SEK    | Total, SEK   |
|------------------------|--------------|-------------|--------------|
| For Bengt G. Nilsson   | 1,200,000.-  | 300,000.-   | 1,500,000.-  |
| For Kaj Hobér          | 700,000.-    | 175,000.-   | 875,000.-    |
| For Christer Thingwall | 700,000.-    | –           |              |
| For Helga Hullmann     | 142,500.-    | –           |              |