11/12 2015 19:01 FAX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

| | |
|---|---|
| In the Matter of Arbitration between | **DECLARATION OF ROVNAG ABDULLAYEV IN SUPPORT OF SOCAR'S MOTION TO DISMISS THE PETITION TO CONFIRM ARBITRATION AWARD** |
| Frontera Resources Azerbaijan Corporation, | |
| Petitioner, | |
| - against - | |
| State Oil Company of the Azerbaijan Republic, | |
| Respondent. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROVNAG ABDULLAYEV deposes and says:

1.     I am the President the State Oil Company of the Azerbaijan Republic ("SOCAR"). I have personal knowledge of the matters stated in this Declaration and, if called upon as a witness, could testify competently as to them.

2.     SOCAR does not transact any business within the State of New York or within the United States, nor does SOCAR contract anywhere to supply goods or services in the State of New York or the United States.

3.     SOCAR does not regularly transact or solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in the State of New York or the United States.

4.     SOCAR does not expect nor should it reasonably expect any of its actions to have consequences in the State of New York or the United States while deriving substantial revenue from interstate or international commerce.

5.    SOCAR does not own, use or possess any real property in the State of New York or in the United States, nor does SOCAR lease or rent property in the State of New York or in the United States.

6.    SOCAR does not have bank accounts in the State of New York or the United States.

7.    SOCAR does not have any employees, sales agents, or assets in the State of New York or the United States.

8.    SOCAR is a "person" for legal purposes.

9.    Petitioner Frontera Resources Azerbaijan Corporation ("Petitioner" or "Frontera") has not compensated SOCAR for its costs of arbitration in the amount of $170,400, as it was ordered to do by the Arbitral Tribunal.

10.    SOCAR's appeal of the Arbitral Tribunal's decision was filed with the Swedish Court of Appeal in Stockholm on February 3, 2006. (Exhibit A)

11.    Pursuant to a direction of the Swedish Court of Appeal, SOCAR made its submission regarding its appeal on April 14, 2006. (Exhibit B).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: April

ABULLAYEV
of SOCAR

1273022v1

-2-

# EXHIBIT A

# HELLSTRÖM

To
Svea Court of Appeal

### SUMMONS APPLICATION

**Plaintiff:**      State Oil Company of the Republic of Azerbaijan

**Counsel:**      Attorney-at-law Staffan Michelson
Hellström Advokatbyrå [Law firm]
Box 7305
103 90 STOCKHOLM

**Defendant:**      Frontera Resources Azerbaijan Corporation

**Counsel:**      Douglas Stinemetz, Esq.
Haynes & Boone LLP
1000 Louisiana St., Suite 4300, Houston, Texas, USA

**Case:**      Challenge of arbitration award

_____

With the authority of the attached power of attorney and in my capacity as counsel for the State Oil Company of Azerbaijan (hereinafter referred to as "SOCAR"), I hereby apply for the summons of Frontera Resources Azerbaijan Corporation (hereinafter referred to as "Frontera") and, in accordance with what follows, challenge the attached arbitration award, Appendix 1, rendered on 16 January 2006, in all respects in which it was not in favour of the plaintiff.

# HELLSTRÖM

1. **Claims**

SOCAR claims that the Court of Appeal, in amending the challenged arbitration award, rejects Frontera's claims, obliges Frontera to fully reimburse SOCAR's costs in the arbitration proceedings, and obliges Frontera to pay the entire costs for the arbitrators.

Should the Court of Appeal find that the arbitration award is not to be amended, it is claimed in the second place that the Court of Appeal revoke the arbitration award in the part concerning the granting of Frontera's claims ("Claim B").

It is furthermore claimed that the Court of Appeal, before passing final judgment in the case, grant a stay of the same and give the arbitrators the opportunity to reopen the arbitration proceedings for new consideration in the issue of Frontera's "Claim B" and the issue of distribution of costs in the case.

SOCAR claims reimbursement for its court costs at amounts that will be submitted later.

2. **Facts**

According to a contract, Appendix 2, applied according to a Protocol, Appendix 3, Frontera transferred to the European Bank for Reconstruction and Development (EBRD) all its rights arising from the "PSA contract" that was referred to as the basis of the arbitration proceedings.

In support of its action, SOCAR also refers to the other facts described during the arbitration proceedings and intends in future briefs, before the challenge period has elapsed, to describe relevant parts of these facts in more detail.

3. **Legal basis**

Arbitration proceedings where the arbitrators concluded the proceedings without ruling on the issues submitted to them for resolution may under Section 36 of the Swedish Arbitration Act (1999:116) be wholly or partly amended upon the application of a party.

An arbitration award which may not be challenged under Section 36 of the Arbitration Act may under Section 34 of the same Act be wholly or partly set aside upon motion by a party *inter alia* if it is not covered by a valid arbitration agreement between the parties, if the arbitrators have exceeded their mandate[1] or if there were other irregularities in the processing, without the fault of a party, which probably influenced the outcome.

4. **Basis for the challenge of the arbitration award**

All of Frontera's rights under the PSA contract were transferred prior to the arbitration proceedings to the EBRD which, in accordance with the Protocol of 4 July 2002, made final legal settlement of the differences in relation to Frontera. Frontera has not submitted any

---

[1] With respect to exceeding the arbitration mandate, it is clear from the preparatory works 1998/99:35 p.145 *inter alia* that exceeding the arbitration mandate may have occurred when the arbitrators have gone beyond the parties' claims. The arbitrators are also in principle deemed to be bound to settle the dispute on the basis of the facts submitted by the parties in support of their action.

# HELLSTRÖM

facts whose legal effect is that any part of these issues under dispute would also be covered by the arbitration agreement between Frontera and SOCAR.

The award is thus not covered by a valid arbitration agreement between the parties.

Should the Court of Appeal find that the award is covered by a valid arbitration agreement between the parties, SOCAR asserts that the arbitrators have exceeded their mandate or that there have been irregularities in the processing which have affected the outcome as the arbitrators, in respect of "Claim B", have ruled over facts which were not referred to or neglected to allow SOCAR the opportunity to respond to what the counterparty asserted.

The arbitration award is to be revoked on the basis now referred to.

Should the Court of Appeal find that the arbitrators have not ruled over other than submitted facts, it is contended that the arbitrators have overlooked – and thus not considered – the issues that SOCAR submitted to them for resolution with regard to the facts surrounding "Claim B". On this basis, the arbitration award is to be amended in accordance with the plaintiff's claim.

5.   **Evidence**

SOCAR reserves the right to present statement of evidence after that SOCAR has taken part of what the counterparty has stated in their response.

6.   **Competence of the Court of Appeal**

As is shown in the arbitration award, the location of the arbitration proceedings between SOCAR and Frontera was Stockholm. It is referred to Section 43 of the Arbitration Act.

Stockholm 3 February 2006

[Signature]

Staffan Michelson

**Appendices:**

1.   Power of attorney
2.   Cheque of SEK 450

# HELLSTRÖM

Till

Svea hovrätt

## ANSÖKAN OM STÄMNING

**Kärande:**   State Oil Company of the Republic of Azerbaijan

**Ombud:**   Advokaten Staffan Michelson

Hellström Advokatbyrå

Box 7305

103 90 STOCKHOLM

**Svarande:**   Frontera Resources Azerbaijan Corporation

**Ombud:**   Douglas Stinemetz, Esq.

Haynes & Boone LLP

1000 Louisiana St., Suite 4300, Houston, Texas, USA

**Saken:**   Klander av skiljedom

Med stöd av bifogad fullmakt får jag i egenskap av ombud för State Oil Company of Azerbaijan (nedan kallat "SOCAR") ansöka om stämning å Frontera Resources Azerbaijan Corporation (nedan kallat "Frontera") och enligt följande klandra bifogad skiljedom, bilaga 1, meddelad den 16 januari 2006 i allt vad den gått käranden emot.

Hellström advokatbyrå
Kungsgatan 33
Box 7305
103 90 Stockholm Sweden
tel +46 8 22 09 00
fax +46 8 20 40 90
www.hellstromlaw.com

# HELLSTRÖM

## 1.  Yrkanden

SOCAR yrkar att hovrätten med ändring av den klandrade skiljedomen lämnar Fronteras yrkanden utan bifall, förpliktar Frontera att utge full ersättning för SOCARs kostnader i skiljeförfarandet samt förpliktar Frontera att betala hela kostnaden för skiljemännen.

För det fall hovrätten finner att skiljedomen inte skall ändras, yrkas i andra hand, att hovrätten upphäver skiljedomen i den del som avser bifall till Fronteras yrkanden ("Krav B").

Vidare yrkas att hovrätten, innan målet slutligt avgörs, skjuter upp detsamma och ger skiljemännen tillfälle att återuppta skiljeförfarandet för förnyad prövning av frågan om  Fronteras "Krav B" och frågan om fördelning av kostnaderna i målet.

SOCAR yrkar ersättning för sina rättegångskostnader med belopp som senare kommer att anges.

## 2.  Sakförhållanden

Frontera har enligt avtal, bilaga 2, som tillämpats enligt protokoll, bilaga 3, till European Bank for Reconstruction and Development (EBRD) överlåtit alla sina rättigheter härrörande från det till grund för skiljeförfarandet åberopade s.k. PSA-avtalet.

SOCAR åberopar till stöd för sin talan härjämte de sakförhållanden i övrigt som anförts under skiljeförfarandet och avser att i kommande inlaga före klandertidens utgång närmare redogöra för nu relevanta delar av dessa sakförhållanden.

# HELLSTRÖM

## 3. Rättsliga utgångspunkter

En skiljedom som innebär att skiljemännen avslutat förfarandet utan att pröva de frågor som lämnats till avgörande av dem får enligt 36 § lagen (1999:116) om skiljeförfarande helt eller delvis ändras på talan av part.

En skiljedom som inte kan angripas enligt 36 § lagen om skiljeförfarande skall enligt 34 § samma lag efter klander helt eller delvis upphävas på talan av part bl.a. om den inte omfattas av ett giltigt skiljeavtal mellan parterna, om skiljemännen har överskridit sitt uppdrag[1] eller om det annars, utan partens vållande, i handläggningen har förekommit något fel som sannolikt har inverkat på utgången.

## 4. Grunder för klandertalan

Samtliga Fronteras rättigheter enligt PSA-avtalet har före skiljeförfarandet överlåtits till EBRD i enlighet med protokollet den 4 juli 2002 rättskraftigt slutreglerat de i förhållande till Frontera utestående tvistefrågorna. Frontera har inte åberopat någon omständighet som har sådan rättsverkan att någon del av dessa tvistefrågor likväl omfattas av mellan Frontera och SOCAR gällande skiljeavtal.

Domen omfattas sålunda inte av ett giltigt skiljeavtal mellan parterna.

Om hovrätten skulle finna att domen omfattas av ett giltigt skiljeavtal mellan parterna gör SOCAR gällande att skiljemännen överskridit sin behörighet, eller att det förekommit fel i handläggningen som inverkat på utgången i det att skiljemännen med avseende på "Krav B" dömt över icke åberopade omständigheter eller underlåtit att bereda SOCAR tillfälle till yttrande över vad motparten anfört.

Skiljedomen skall på nu anförda grunder upphävas.

---

[1] Såvitt gäller överskridande av skiljemannauppdrag framgår av prop. 1998/99:35 s. 145 bl.a. att ett överskridande av skiljemannauppdraget kan ha skett genom att skiljemännen gått utöver parternas yrkanden. Vidare anses skiljemännen principiellt bundna att avgöra tvisten med stöd av de omständigheter som parterna har åberopat till grund för sin talan.

# HELLSTRÖM

Om hovrätten skulle finna att skiljemännen inte dömt över annat än åberopade omständigheter, görs gällande att skiljemännen förbisett – och sålunda inte prövat – frågor som SOCAR överlämnat till dem för avgörande med avseende på omständigheterna kring "Krav B". Skiljedomen skall på dessa grunder ändras i enlighet med kärandens yrkande.

### 5. Bevisning

SOCAR förbehåller sig rätten att inkomma med bevisuppgift sedan SOCAR tagit del av vad motparten anfört i svaromål.

### 6. Hovrättens behörighet

Som framgår av skiljedomen var platsen för skiljeförfarandet mellan SOCAR och Frontera Stockholm. 43 § lagen om skiljeförfarande åberopas.

Stockholm den 3 februari 2006

Staffan Michelson

**Bilagor:**
1. Fullmakt
2. Check om 450 kr

# EXHIBIT B

To

Svea hovrätt
Department 02

**Case nr T 980-06 <u>State Oil Company of Azerbaijan</u> ./. Frontera Resources Azerbaijan Corporation regarding challenge of arbitration award**

In the capacity of representative of SOCAR I hereby, to supplement the plaint, would like to state the following.

**1. Facts**

*1.1 The subject of the challenge (summary)*

1. The case concerns in summary *partly* the question whether the challenged arbitration award is covered by a valid arbitration agreement between SOCAR and Frontera, *partly* the effect of the arbitrators having concluded the proceedings without having tried one of SOCAR submitted counter claim.

*1.2 Underlying developments*

2. In the Republic of Azerbaijan there are oil deposits inter alia at the oil fields Kursangi and Karabagli (the K&K fields).

3. SOCAR, a state owned company in the Republic of Azerbaijan, manages the natural oil resources of the Republic.

4. Frontera is an oil exploitation company incorporated in Cayman Islands.

5. In November 1998 SOCAR and Frontera and two other parties entered into an agreement (PSA) which gave Frontera the right to exploit certain oil deposits if Frontera committed itself to deliver, each calendar quarter, an agreed amount of the extracted oil to a certain fixed local price to SOCAR. The structure of the agreement meant that Frontera, as soon as the delivery obligation had been fulfilled, had the right to export all other oil from the fields to the world market price and thereby get compensated for the costs and the surplus of the production.

6. The oil which should be delivered to SOCAR according to the agreement is called the Local Market Oil (LMO).

7. The project has been financed inter alia by a loan from the European Bank for Reconstruction and Development, EBRD, (the Bank).

8. Frontera commenced the production mid November 1999 and delivered for the last calendar quarter of this year a quantity of LMO. This was also done for the first calendar quarter of 2000.

9. In the beginning of February 2000 SOCAR had not paid for the delivered oil. No invoice or any other accounting document had been received.

10. On 10 February 2000 Frontera's CEO Steve Nicandros and the president of SOCAR Natig Aliyev had a meeting. The parties have presented different opinions about the purpose and the effect of the meeting, but the arbitrators have found that the meeting resulted in an agreement implying that SOCAR should have the right to set off its debt for the delivered oil provided that SOCAR during a period waived its right to deliveries according to the PSA.

11. During May – October 2000 SOCAR ordered Frontera to resume observance of the PSA. Instead Frontera sold all extracted oil on the export market for world market price.

12. In mid November 2000 SOCAR instructed the Azeri Customs Authorities to stop Frontera's export of oil. The parties meet again and negotiated an agreement which is documented in a protocol from December 2000 (the December 2000 Protocol). The agreement means in summary that the parties agreed to resume observance of the PSA. In the arbitration proceedings Frontera has not confessed the agreement, but the arbitrators have found the agreement binding and have stated that Frontera was obliged to fulfil deliveries of LMO in accordance with the PSA from 1 January 2001.

13. In March 2002 the Bank declared that the loan had fallen due. The reason was that Frontera had failed to fulfil the conditions in the loan agreement. Through a series of documents a transfer of all of Frontera's rights to the Bank was carried out (see below p. 5 and 8).

14. With the Bank as owner of Frontera's rights according to the PSA, SOCAR entered into a settlement on 4 July 2002 which according to SOCAR meant that all of the parties' unsettled matters were finally settled (see below p. 5 and 7).

*1.3 The arbitration agreement*

15. The arbitration agreement, which in its entirety is reported on p. 3- 5 in the arbitration award, contains in the Swedish translation the following:

> **SECTION 26.3: Arbitration**
> (a) Except for any matter to be referred to an expert pursuant to Articles 16.2 (a)(ii) and 16.2 (c), in the event of a dispute arising between SOCAR and any or all of the Contractor parties (including matters which are not resolved at the Steering Committee), the disputing Parties shall meet in an attempt to resolve the dispute to their mutual satisfaction[1] by reference to the terms of this Agreement. If

---

[1] Eng. "meet in attempt to resolve the dispute to their mutual satisfaction".

3

satisfactory mutual agreement[2] is not achieved within thirty (30) days after receipt by a Party of notice of such dispute, such dispute shall be settled in accordance with the Arbitration Procedure and the applicable law provisions of Article 26.1.
...

(c) The rights and obligations under this Article 26.3 shall survive the termination of this Agreement.
...

### APPENDIX 6: ARBITRATION PROCEDURE

Except as otherwise provided in this Agreement, all disputes arising between SOCAR and any or all of the Contractor Parties, including without limitation, any dispute as to the validity, construction, enforceability or breach of this Agreement, which are not amicably resolved by the Parties in accordance with the provisions of the Article 26.3 (a) shall be finally settled by a sole arbitrator appointed by the unanimous decision of the Parties or, in the absence of such unanimous decision, by a panel of three (3) arbitrators, under the Arbitration Rules of The United Nations Commission on International Trade Law known as UNCITRAL (the "Rules") adopted on 15 December 1976 as amended by UNCITRAL from time to time. In the event the Rules fail to make provisions for any matter or situation the arbitration tribunal shall establish its own rules to govern such matter and procedure and any such rules so adopted shall be considered as a part of the Rules. For purpose of allowing such arbitration, and enforcement and execution of any arbitration decision, award, issuance of any attachment, provisional remedy or other pre-award remedy, each Party waives any and all claims to immunity, including, but not limited to, any claims to sovereign immunity.

16. When studying the arbitration agreement it shall particularly be noted that the agreement is conditioned by two settled conditions, namely *partly* that the parties first have tried to resolve the dispute in an amicable manner and *partly* that an amicable solution has not been reached.

### 1.4 The Settlement

17. After that the oil extraction according to the PSA had been initiated differences of opinion arose already during 2000 between SOCAR and Frontera regarding the parties' rights and obligations with regard to deliveries of LMO. When the Bank later assumed Frontera's rights

---

[2] Eng. "satisfactory mutual agreement".

and position no amicable solution had yet been reached through negotiations according to the rules in the arbitration agreement. As is described more detailed in the protocol of 4 July 2002 (the July 2002 Protocol, Attachment 3 to the application for a summons) such negotiations were carried out later.

18. The negotiations resulted in the parties agreeing on a final settlement of their differences of opinion regarding LMO during 1999/2000[3]. SOCAR accepted that the original parties were deemed to have fulfilled their obligations regarding delivery and sale and payment of LMO and the Bank together with the other parties accepted that SOCAR should be deemed to have fulfilled its obligations regarding payment of LMO during the period 1 November 1999 up to and including 31 December 2000 (see further below p. 7).

*1.5 Frontera's transfer of its rights*

19. As has been mentioned above the project has been financed inter alia through loans from the European Development Bank. As a security for the loan Frontera transferred to the Bank on 14 November 2000 through a Deed of Assignment (Attachment 2 to the application for a summons) all its rights according to the PSA. The transfer meant, according to section 2, that Frontera assigns and agrees to assign absolutely to the Bank all of the Assignor's rights, i.e., that Frontera transfers and accepts to finally transfer to the Bank all of its rights which belongs to Frontera according to the PSA.

20. Since the loan in March 2002 had been declared to have fallen due by the Bank, the transfer agreement entered into force and was executed in a manner further regulated in the Deed of Release and Indemnity entered into on 21 April 2002.

21. On the basis of the transfer the Bank and SOCAR entered into a settlement which is expressed in the July 2002 Protocol.

---

[3] July 2002 Protocol, see inter alia sections (i), 2.1, 2.2, 2.3, 4 and 5.

22. No fact which has resulted in Frontera re-acquiring any against SOCAR on the PSA based right regarding outstanding debts is known. Further, there is no information about Frontera having exempted any such right at the time of the transfer to the Bank and that Frontera therefore despite of the transfer should have remained in a part relationship with SOCAR (see further below p. 8).

*1.6 Compilation of the facts*

23. A further account of the underlying facts is attached as <u>Attachment 1</u>.

## 2. The arbitration

*2.1 Claims*

24. Frontera has in the arbitration proceedings claimed that the arbitrators shall order SOCAR to pay an amount of USD 15,737,447 in addition to interest. The amount has been calculated according to the following:

A. Loss due to non-payment of oil which had been delivered during the last calendar quarter of 1999 and the first calendar quarter of 2000 (15 November 1999 – 31 March 2000) amounting to USD 2,274,499.

B. The value of the oil deliveries which SOCAR took during the autumn 2000 (November – December) amounting to USD 1,968,709.

C. Compensation for deliveries to SOCAR which has been made to LMO price instead of net back price during the period 1 January 2001 – 7 March 2002 with an amount of USD 11,494,238.

25. SOCAR has contested liability to pay for the parts of the claim which concerns claims A and B since all unsettled matters regarding the LMO dispute were regulated and finally settled by the July 2002 Protocol. SOCAR has also contested the part of the claim which concerns claim C since the December 2000 Protocol establishes that Frontera should have delivered oil to SOCAR during the following period to LMO price. SOCAR has further brought forward that also the July 2002 Protocol covers claim C.

26. SOCAR has, in case the arbitrators should find that the July 2002 Protocol is not a binding final settlement of the parties unsettled matters, submitted a counter claim towards Frontera of USD 11,199,771.

27. SOCAR has claimed full compensation for its costs for the trial.

*2.2 Submitted facts*

28. SOCAR submits in the court of appeal the same facts as in the arbitration proceedings and wishes to put forward especially the following as a basis for the challenge of the arbitration award.

*2.2.1 The disputed is settled and the arbitration award is not covered by the arbitration agreement*

29. The arbitration agreement is, as has been mentioned above (p. 4), conditioned upon that an amicable settlement has not been reached trough settlement negotiations. After that the parties have met and tried to settle a dispute and failed to do so a request for arbitration may have legal effect.

30. SOCAR has in the arbitration proceedings regarding this issue already in its first submission on 30 January 2004 called attention to the fact that Claims A and

7

B have been settled by binding agreement and resolved after negotiations[4]. All remaining claims between the parties from the period 1999/2000 were related to LMO and were settled and finally resolved with the Bank on Frontera's behalf by agreement which is presented in the July 2002 Protocol signed by SOCAR and the Bank. SOCAR has requested in the arbitration proceedings that this matter shall be resolved separately and has expressly made clear that Frontera has no right to request arbitration regarding these claims. In a submission to the arbitrators on 2 April 2004 it was brought forward with special clarity that

> *Frontera is not entitled to bring proceedings in respect of Claims A and B because both claims were resolved by the 4 July 2002 Protocol[5].*

31. SOCAR has further added that non-contractual disputes, not arising out of the PSA, and which are unrelated to the contractual rights of the parties to the PSA, do not come within the terms of reference laid down in the arbitration agreement.

32. A more detailed summary of what Frontera has submitted in the arbitration proceedings regarding this matter is attached as Attachment 2.

*2.2.2 Frontera has transferred the object of the dispute to the Bank and has therefore no standing in the arbitration proceedings*

33. SOCAR has in the arbitration proceedings consistently referred to the fact that Frontera through the transfer of all rights to the Bank has left the part relationship and that Frontera therefore has no standing in the case.

---

[4] Claim C was according to SOCAR's opinion without basis already following the PSA and the December 2000 Protocol.
[5] Eng. in our submission, Frontera are not entitled to bring proceedings in respect of Claims A and B because both claims were resolved by the 4 July 2002 Protocol.

34. A more thorough summary of what Frontera has argued in the arbitration proceedings in this matter is attached as Attachment 3.

*2.2.3 SOCAR's counter claim*

35. SOCAR has in the arbitration proceedings argued, in case the arbitrators should find that Claim A and Claim B have been settled finally and with legal force through the July 2002 Protocol, that the claims which SOCAR had cancelled through this settlement should be brought up as a counter claim and thus deducted from Frontera's claim. The arbitrators have neglected to take up SOCAR's counter claim to examination.

36. The arbitrators' reason for trying SOCAR's counter claim was according to the opinion of the court the following (Arbitration award, English version, p. 54):

> *SOCAR submits its counterclaim only in case the Tribunal concludes that the July2002 Protocol is not av valid agreement. The Tribunal holds that this Protocol is valid. Consequently, the counterclaim fails.*

37. It is clear from the submissions of SOCAR before the arbitrators that SOCAR has argued that the July 2002 Protocol with legal force and completely regulated SOCAR's then remaining claims as well as Frontera's claims expressed in the terms of Claim A and Claim B. Further, it has been evident that SOCAR with its statements concerning the July 2002 Protocol has argued that the Protocol covered a final settlement with legal force of all of the parties' claims against each other. Thus, SOCAR has with the term "valid agreement" argued that the agreement was valid in its entirety, with legal force and effective on both claims of Frontera.

38. According to SOCAR's opinion it ought not to have been misunderstood by the arbitrators that the counter claim should be tried unless the July 2002 Protocol constituted sufficient basis for rejection of both Frontera's claims.

39. The aforementioned means that the arbitrators have brought the proceedings to an end without having tried the issue of SOCAR's counter claim.

### 2.2.4 Definition of the "LMO Dispute"

40. In submissions to the arbitrators after the oral hearing, Frontera argued that there was a difference between *"seized"* and delivered oil, i.e. that Claim B should not have been included in the settlement of the LMO Dispute in the July 2002 Protocol. The December 2000 Protocol, however, referred to LMO and export in the same context as the seizure. Further, the July 2002 Protocol refers to LMO as well as Crude Oil. SOCAR submits, that there can be no doubt what so ever, that Claim B is part of the LMO dispute.

41. However, SOCAR was never given any opportunity to comment this part of Fronteras submissions.

## 3. Legal basis

42. According to section 34, 1. in the Swedish Arbitration Act an arbitration award shall following an application be wholly or partially set aside upon motion of a party if it is not covered by a valid arbitration agreement between the parties. The same is valid according to section 34 2. if the arbitrators otherwise have exceeded their mandate.

43. Point 1 is applicable should the parties not have entered into a valid arbitration agreement. That situation is not of interest in this case. Point 1 is also applicable if the arbitrators have tried a matter which falls outside a valid arbitration agreement. The boundary against cases of exceeding of mandate is vague but has been deemed to have no practical meaning. Finally the clause is applicable when a party argues that an arbitration agreement is not valid anymore between the parties. It may be a matter of original invalidity as well as an argument that the

agreement has become invalid later. A party may for example argue that the agreement is unreasonable according to section 36 of the Swedish Contracts Act[6].

44. The issue whether the dispute is covered by a valid arbitration agreement or not shall be tried taking section 3 of the Swedish Arbitration Act and the so called doctrine of separability into account[7]. When ruling on the validity of an arbitration clause which forms part of another contract, when deciding the jurisdiction of the arbitrators the arbitration clause shall be deemed to constitute an agreement separate from the other contract. Often the losing party is of the opinion that the whole contract is invalid or annulled. According to the doctrine of separability this does not constitute a basis for the arbitration agreement to be invalid. Only if the invalidity argument specifically is aiming at the arbitration clause this will have no effect.

45. Further, it ought to be generally accepted that the type of arbitration clause covering all disputes arising out of an agreement covers also disputes which has a connection with the original contract. Should the parties have entered into an amicable settlement the settlement means that the material matters have been settled, however not automatically that the arbitration clause has been terminated[8]. Another situation is if the arbitration clause itself – as in the present case – contains a condition meaning that arbitration proceedings may be held only for disputes which have not been possible to resolve amicably. The arbitration clause then contains only disputes falling outside of these categories. If the arbitration clause is drafted in such a way a dispute which has been settled or left without settlement may not be the basis for arbitration proceedings[9].

46. Have the arbitrators tried a dispute which falls outside of a valid arbitration agreement the appeal court shall annul the same[10].

---

[6] Preparatory works 1998/99:35 p. 235.

[7] Cf. Heumann, Skiljemannarätt (*Eng. Arbitration Law of Sweden*), p. 62 ff.

[8] Cf. Heumann, p. 137.

[9] Cf. Heumann, p. 154.

[10] The aforementioned does not mean that the award shall be annulled only when the arbitrators have been unauthorised to try the dispute. In cases belonging to this type of category with so called double relevant legal facts it is sometimes risky to decide already when making the preliminary assessment of the competence whether an agreement is valid or not. For the arbitrators to be deemed to be competent to try the dispute it is however

47. In the present case there is no indistinctness about the fact that the parties originally have entered into a valid arbitration agreement. However, SOCAR argues that the arbitration award as regards the present dispute (Claim B) is not covered by the arbitration agreement as this dispute has been settled amicably and is thereby expressly exempted from the scope of the arbitration agreement.

48. Further, SOCAR argues that Frontera, by transferring all of its rights according to the PSA to the Bank, also has transferred the rights stemming from the arbitration agreement.

49. According to current principles for the division of litigation costs the winning party is entitled to compensation for its costs for the arbitration proceedings. SOCAR, which has been awarded a third of its costs, is essentially the winning party, and should therefore have been awarded compensation for the majority of its costs.

**4. Basis for the challenge of the award**

50. SOCAR, having expressly and/or implicitly submitted the corresponding facts and arguments before the Tribunal, hereby specifies the basis for its challenge of the arbitration award according to the following.

*4.1 The dispute is settled and the arbitration award is therefore not covered by the arbitration agreement*

51. According to the arbitration agreement entered into by SOCAR and Frontera arbitration proceedings concerning the trial of a dispute may only be held

---

sufficient that the plaintiff argues that a valid agreement exists and that this argument is not completely without basis (Pålsson SvJT 1999 p. 315 and NJA 2005 p. 586). A decision in this respect is however not binding (section 2, second paragraph, in the Swedish Arbitration Act). Should the plaintiff not be able to prove the validity of the agreement as regards the subject of the dispute the plaintiff's action may not be approved and an arbitration award which is not correct in this respect shall after having been challenged by annulled by the court.

provided that *partly* the parties have made an attempt to solve the dispute amicably and *partly* that no amicable settlement has been reached.

52. The dispute which, according to the challenged arbitration award, has been decided ordering SOCAR an obligation to pay has been settled amicably by an agreement according to the July 2002 Protocol. The arbitration agreement is not valid for such a dispute. The award is therefore not covered by a valid arbitration agreement between the parties.

53. Should the court of appeal, against the opinion of SOCAR, find that the dispute has not been settled through the July 2002 Protocol, SOCAR argues that the same should not be covered by the settlement negotiations according to what is stated in the arbitration agreement. The award is therefore not covered by a valid arbitration agreement between the parties.

54. In case the court of appeal, against SOCAR's opinion, should find that the dispute has been the object of such negotiations which are described in the arbitration agreement and despite that is not covered by the arbitration agreement, SOCAR argues that Frontera's claim is outside of the scope of the contractual relationship between the parties and thus is not covered by a valid arbitration agreement between the parties.

55. In case the court of appeal should find that the award is covered by a valid arbitration agreement between the parties SOCAR argues that the arbitrators on a corresponding basis (points 49-52 above) through their approval of Frontera's claims in any case have exceeded their mandate.

56. The award shall on the basis of the aforementioned be annulled (section 34 1. and 2. in the Swedish Arbitration Act).

*4.2 Frontera has transferred the object of the dispute to the Bank and has therefore no part's standing in the arbitration proceedings*

57. In case the court of appeal should not find a basis in the arbitration agreement to annul the award, SOCAR argues that Frontera through its transfer of all rights to the Bank anyhow has deprived itself its party's standing in relation to SOCAR and therefore has not been authorised to request arbitration. The arbitrators have therefore not been qualified to try the dispute. The arbitration award shall also on this basis be annulled (section 34 1. and 2. in the Swedish Arbitration Act).

*4.3 Errors in the procedure*

58. In Post Hearing Submissons after the oral proceedings, but not earlier during the procedure, Frontera has submitted facts about "*seized*" oil, as something different than "*delivered*" oil, and argued that Claim B therefore should not be included in the settlement of the LMO-dispute in the July-agreement.

59. Frontera has not at any occasion before or during the oral hearing raised the question that the LMO Dispute should not conclude Claim B.

60. The submission is groundless and wrong. The July 2002 Protocol has – even with explicit referral to *Crude Oil* – included the oil which was to be delivered according to the December 2000 Protocol and SOCAR can produce evidence proving that the July 2002 Protocoll includes Claim B.

61. SOCAR has not been given opportunity either to comment those new statements or to produce evidence against them.

62. As Frontera has been allowed to submit new facts and make new statements in this respect, without any opportunity for SOCAR to reject, SOCAR has also been

14

deprived every chance to prove that the statement was groundless. Frontera were not a party to the July 2002 Protocol and had no possibility to prove their statement. SOCAR, on the other hand should have been able to prove that the statement was wrong. For those who negotiated the July 2002 Protocol it was doubtless, that the LMO Dispute included the whole debacle without any exception what so ever of the kind that Frontera by a semantic explanation has argued.

63. SOCAR has not been given any opportunity to comment the submission of those new facts. The fact that the arbitrators nevertheless have based the award on facts thus submitted is a procedure error which has effected the conclusion. The award is even on this basis to be cancelled  (section 34 6. in the Swedis Arbitration Act).

*4.4 The arbitrators have not tried SOCAR's counter claim*

64. If not all of the outstanding claims per 4 July 2002 should be deemed to have been finally settled by the July 2002 Protocol, SOCAR has submitted a counter claim against Frontera of USD 11,199,771. SOCAR argues that the arbitrators should have tried this claim.

65. SOCAR has shown basis for its claim.

66. The arbitration award shall be amended in accordance with the above meaning that SOCAR's claim is accounted from Frontera's claim, that Frontera's claim is rejected and that Frontera is ordered to pay the excess part of SOCAR's claim and the whole cost for the arbitration proceedings (section 36 of the Swedish Arbitration Act).

**5. Injunction from Svea hovrätt**

67. I have the following comments on the injunction from the court.

68. It is referred to the complete amount.

69. Frontera has late in the proceedings claimed that the term "LMO Dispute" in the Deed of Release should mean only Claim A. In a brief handed in after the oral hearings Frontera claimed that there is a difference between "seized" and "delivered" oil, i.e., that Claim B should not be covered by the settlement of the LMO dispute in the July 2002 Protocol.

70. This argument which has been of decisive impact for the outcome, Frontera has developed in the Post Hearing Brief Submission on 16 May 2005 after the oral hearings. SOCAR has not been given the opportunity to respond to this.

71. The amended claim according to section 36 of the Arbitration Act is based on the fact that SOCAR's counter claim has not been tried (sections 35-39 and 64-66 in this brief).

**6. Evidence**

72. SOCAR wishes to present statement of evidence in the court of appeal after that the answer from the defendant has clarified to what extent the submitted facts are disputed or not.

Stockholm 12 April 2006

Staffan Michelson

# HELLSTRÖM

Till

    Svea hovrätt

    Avdelning 02

**Mål nr. T 980-06 State Oil Company of Azerbaijan ./. Frontera Resources Azerbaijan Corporation angående klander av skiljedom**

Såsom ombud för SOCAR får jag till komplettering av käromålet anföra följande.

## 1. Sakförhållanden

*1.1 Klandertalans föremål (sammanfattning)*

1. Målet gäller sammanfattningsvis *dels* frågan om den klandrade skiljedomen omfattas av ett giltigt skiljeavtal mellan SOCAR och Frontera, *dels* fråga om fel i handläggningen, *dels* verkan av att skiljemännen avslutat förfarandet utan att pröva en av SOCAR anhängiggjord motfordran.

*1.2 Bakomliggande händelseutveckling*

2. I republiken Azerbaijan finns oljefyndigheter bl.a. på oljefälten Kursangi och Karabagli ("K&K-fälten").

3. SOCAR, ett statligt bolag i Azerbaijan, förvaltar republikens naturligen förekommande oljetillgångar.

hellström advokatbyrå
kungsgatan 33
box 7305
103 90 stockholm sweden
tel +46 8 220000
fax +46 8 204090
www.hellstromlaw.com

4. Frontera är ett Caymanregistrerat oljeexploateringsbolag.

5. I november 1998 ingick SOCAR med Frontera och två andra parter ett avtal ("PSA") som gav Frontera en rätt att exploatera vissa oljefyndigheter mot att Frontera åtog sig att till SOCAR kvartalsvis leverera en överenskommen mängd av den utvunna oljan till ett visst fixerat lokalt pris. Avtalskonstruktionen innebar att Frontera, så snart denna leveransskyldighet fullgjorts, hade rätt att exportera all ytterligare olja från exploateringsområdet till världsmarknadspris och därigenom gottgöra sig kostnaderna för och överskottet av produktionen.

6. Den olja som enligt avtalet skulle levereras till SOCAR kallas i mellanhavandet Lokalmarknadsolja ("LMO").

7. Projektet har finansierats bl.a. genom lån från Europeiska utvecklingsbanken (European Bank for Reconstruction and Development, EBRD) ("Banken").

8. Frontera påbörjade produktionen i mitten av november 1999 och levererade för sista kvartalet detta år en kvantitet LMO. Så skedde också för första kvartalet 2000.

9. I början av februari 2000 hade SOCAR inte betalat för den levererade oljan. Någon faktura eller något räkenskapsunderlag hade heller inte erhållits.

10. Den 10 februari 2000 träffades Fronteras verkställande direktör Steve Nicandros och SOCARs verkställande direktör Natig Aliyev i ett möte. Parterna har redovisat skilda uppfattningar om mötets syfte och verkan, men skiljemännen har funnit, att detsamma ledde till en överenskommelse av innebörd bl.a. att SOCAR skulle äga rätt att kvitta sin skuld för den levererade oljan mot att SOCAR för en tid avstod från sin rätt till leveranser enligt PSA.

11. Under maj – oktober 2000 uppmanade SOCAR härefter Frontera att återuppta efterlevnaden av PSA. Istället sålde emellertid Frontera all utvunnen olja på exportmarknaden till världsmarknadspris.

12. I mitten av november 2000 instruerade SOCAR Azerbaijans tullmyndigheter att stoppa Fronteras oljeexport. Härefter träffades parterna på nytt och förhandlade fram en överenskommelse som dokumenterats i ett protokoll från december 2000 ("December-avtalet"). Överenskommelsen innebar sammanfattningsvis, att parterna enades om att återuppta efterlevnaden av PSA. Frontera har i skiljeförfarandet inte vidgått överenskommelsen, men skiljemännen har funnit densamma bindande och konstaterat att Frontera var skyldigt att från den 1 januari 2001 fullgöra leveranser av LMO i enlighet med PSA.

13. I mars 2002 förklarade Banken sitt lån förfallet till betalning. Orsaken härtill var brister i fullgörelse av låneavtalet. Genom en serie dokument genomfördes därför en överlåtelse av samtliga Fronteras rättigheter till Banken (se nedan s. 5 och 9).

14. Med Banken såsom innehavare av Fronteras rättigheter enligt PSA träffade SOCAR den 4 juli 2002 en förlikning som enligt SOCARs uppfattning innebär att parterna samtliga mellanhavanden slutligt reglerats (se nedan s. 5 och 8).

*1.3 Skiljeavtalet*

15. Skiljeavtalet, som i sin helhet finns återgivet på s. 3 – 5 i skiljedomen, innehåller i svensk översättning bl.a. följande:

*PARAGRAF 26.3: Skiljeförfarande*
*(a) Med undantag för frågor som skall hänskjutas till*
*avgörande av sakkunnig enligt Artiklarna 16.2 (a) (ii) och*
*16.2 (c), skall, om tvist uppkommer mellan SOCAR och en*
*eller flera av Entreprenörerna (inklusive frågor som inte*

kan lösas av styrelsen) de tvistande Parterna mötas för att
försöka finna en ömsesidigt godtagbar lösning[1] av tvisten
genom tillämpning av villkoren i detta avtal. Om en
ömsesidigt godtagbar överenskommelse[2] inte uppnåtts
inom trettio (30) dagar från det att Part mottagit
underrättelse om sådan tvist, skall tvisten avgöras i
enlighet med vad som stadgas om Skiljeförfarande och
tillämplig lag i Artikel 26.1

— . — . — .


(c)Rättigheterna och förpliktelserna enligt denna Artikel
26.3 skall fortsätta att gälla efter avtalets upphörande.

— . — . — .


## BILAGA 6: SKILJEFÖRFARANDE

Om inte annat stadgas i detta Avtal skall alla tvister som
uppkommer mellan SOCAR och någon eller några av
Entreprenörerna utan begränsning inkluderande varje
tvist angående giltigheten, tolkningen, verkställbarheten
eller brott mot Avtalet, som inte löses i samförstånd av
Parterna enligt bestämmelserna i Artikel 26.3 (a) slutligen
avgöras av en skiljeman som utsetts genom enhälligt
beslut av Parterna eller, om sådant enhälligt beslut inte
kan fattas, av en skiljedomstol bestående av tre (3)
skiljemän enligt Förenta Nationernas kommissions för
internationell handelsrätt (UNCITRAL) skiljedomsregler
("UNCITRAL-reglerna"), antagna den 15 december 1976
och med de ändringar som från tid till annan gjorts av
UNCITRAL. Om UNCITRAL-reglerna skulle sakna
bestämmelser i någon fråga eller situation skall
skiljedomstolen fastställa egna regler för frågan eller
situationen och varje sålunda fastställd regel skall anses
utgöra en del av UNCITRAL-reglerna. För att möjliggöra
sådant skiljeförfarande och verkställighet eller exekution
av beslut, skiljedom, interimistiskt förordnande om
kvarstad eller annat interimistiskt rättsmedel, förbinder
sig Parterna att avstå från att åberopa immunitet utan
begränsning inkluderande statsrättslig immunitet.

---

[1] Eng. "meet in an attempt to resolve the dispute to their mutual satisfaction".
[2] Eng. "satisfactory mutual agreement".

16. Vid läsningen av skiljeavtalet bör särskilt observeras, att detsamma är uttryckligen villkorat av två bestämda förutsättningar, nämligen *dels* att parterna först gjort ett försök att lösa tvisten på frivillig väg, *dels* att någon frivillig lösning inte uppnåtts.

*1.4 Förlikningen*

17. Efter det att oljeutvinningen enligt PSA inletts uppstod redan under 2000 meningsskiljaktigheter mellan SOCAR och Frontera om parternas rättigheter och skyldigheter med avseende på leveranser av LMO. När Banken senare övertog Fronteras rättigheter och partsställning hade någon lösning i samförstånd genom förhandlingar enligt skiljeavtalets föreskrifter ännu inte uppnåtts. På sätt närmare redovisas i protokollet av den 4 Juli 2002 ("Juli 2002-protokollet", bilaga 3 till stämningsansökan) genomfördes emellertid sedermera sådana förhandlingar.

18. Förhandlingarna resulterade i att parterna avtalade om en slutlig reglering av sina meningsskiljaktigheter avseende LMO för 1999/2000[1]. SOCAR godtog att de ursprungliga avtalsparterna ansågs ha uppfyllt sina skyldigheter avseende leverans och försäljning av samt betalning för LMO, medan Banken tillsammans med övriga avtalsparter godtog att SOCAR skulle anses ha uppfyllt alla sina skyldigheter avseende betalning för LMO för tiden 1 november 1999 till 31 december 2000 (se vidare nedan s 8.).

*1.5 Fronteras överlåtelse av sina rättigheter*

19. Som ovan nämnts, har projektet finansierats bl.a. genom lån från Europeiska utvecklingsbanken. Till säkerhet för lånet överlät Frontera till Banken den 14 november 2000 genom en "Deed of Assignment" (bilaga 2 till stämningsansökan) alla sina rättigheter enligt PSA. Överlåtelsen innebar enligt paragraf 2, att Frontera

---

[1] Juli 2002-protokollet, se bl.a. punkterna (i), 2.1, 2.2, 2.3, 4, och 5.

*assigns, and agrees to assign, absolutely to the Ban,k all of the Assignor's rights,* dvs.
att Frontera *överlåter och accepterar att slutligt till Banken överlåta alla rättigheter*
som tillkommer Frontera enligt PSA.

20. Sedan lånet i mars 2002 av Banken förklarats förfallet till betalning, trädde
överlåtelseavtalet i kraft och verkställdes på sätt som närmare reglerats genom ett den
21 april 2002 ingånget avtal betecknat *Deed of Release and Indemnity.*

21. På grundval av överlåtelsen träffade Banken med SOCAR sedan den förlikning som
återges i Juli 2002-protokollet.

22. Någon omständighet som fått till följd att Frontera efter det att överlåtelsen verkställts
har återförvärvat någon mot SOCAR på PSA grundad rättighet avseende utestående
fordringar är inte känd. Det finns heller ingen uppgift om att Frontera vid överlåtelsen
till Banken undantagit någon sådan rättighet och att Frontera därför trots överlåtelsen
skulle kvarstå i ett partsförhållande med SOCAR (se vidare nedan s. 9).

*1.6 Sammanställning sakförhållanden*

23. En närmare redogörelse för sakförhållandena bifogas som <u>bilaga 1.</u>

## 2. Skiljeförfarandet

*2.1 Yrkanden*

24. Frontera har i skiljeförfarandet yrkat att skiljemännen skall förplikta SOCAR att utge
ett kapitalbelopp om USD 15 737 447 jämte ränta. Kapitalbeloppet har beräknats
enligt följande:

A. Förlust på grund av utebliven betalning för olja som levererats under sista kvartalet

1999 och första kvartalet 2000 (15 november 1999 – 31 mars 2000), uppgående till USD 2 274 499 ("Krav A").

B. Värdet på de oljeleveranser som SOCAR tillgodogjorde sig under hösten 2000 (november – december) uppgående till USD 1 968 709 ("Krav B").

C. Ersättning för leveranser till SOCAR som skett till LMO-pris istället för netback-pris under perioden 1 januari 2001 – 7 mars 2002 med ett belopp om USD 11 494 238 ("Krav C").

25. SOCAR har bestritt betalningsskyldighet för de delar av yrkandet som avser Krav A och Krav B eftersom samtliga mellanhavanden med avseende på LMO-tvisten reglerades och slutgiltigt löstes genom Juli 2002-avtalet. SOCAR har också bestritt den del av yrkandet som avser Krav C, eftersom December 2000-protokollet fastställer att Frontera skulle leverera olja till SOCAR under den följande perioden till LMO-pris. SOCAR har också anfört att även Juli 2002-avtalet omfattar Krav C.

26. SOCAR har, för det fall skiljemännen inte skulle finna att Juli 2002-avtalet utgjorde en bindande slutreglering av parternas mellanhavanden, gjort gällande ett motkrav mot Frontera om USD 11 199 771.

27. SOCAR har begärt full ersättning för sina rättegångskostnader.

## 2.2 Åberopade omständigheter

28. SOCAR åberopar i hovrätten samma omständigheter som i skiljeförfarandet och lägger av dessa särskilt följande till grund för sin klandertalan.

*2.2.1 Tvisten är förlikt och skiljedomen omfattas därför inte av det ingångna skiljeavtalet*

29. Skiljeavtalet är som ovan (s. 5) framhållits villkorat av att någon frivillig uppgörelse genom förlikningsförhandlingar inte kunnat komma till stånd. Först sedan parterna efter en uppkommen tvist har träffats i förlikningsförhandlingar och misslyckats med att den vägen frivilligt lösa tvisten, kan påkallelse av ett skiljeförfarande äga rättslig verkan.

30. SOCAR har i skiljeförfarandet på denna punkt redan i sin första inlaga den *30 januari 2004* påtalat det förhållandet att Krav A och Krav B genom bindande avtal blivit förlikta och lösta efter förhandlingar[1]. Alla kvarvarande krav mellan parterna från tiden 1999/2000 var relaterade till LMO samt gjordes upp och reglerades slutligt med Banken å Fronteras vägnar genom avtal som redovisas i Juli 2002-protokollet, undertecknat av SOCAR och Banken. SOCAR har hos skiljemännen begärt att denna fråga skall avgöras särskilt och uttryckligen gjort gällande att Frontera saknat rätt att påkalla skiljedomsprövning med avseende på dessa krav. I skrift till skiljemännen den 2 april 2004 anfördes med särskild tydlighet att

> *Frontera är inte behörigt att inleda skiljeförfarande med*
> *avseende på Krav A och B eftersom dessa båda krav löstes*
> *genom 4 juli 2002-protokollet.*[1]

31. SOCAR har vidare tillagt att utomkontraktuella tvister som inte härrör ur PSA och inte är relaterade till Parternas kontraktuella rättigheter enligt PSA faller utanför de ramar som anges i skiljeavtalet.

32. En utförligare sammanfattning av vad Frontera anfört i skiljeförfarandet i denna fråga bifogas som bilaga 2.

---

[1] Krav C var enligt SOCARs inställning grundlöst redan till följd av PSA och December 2000-protokollet.

*2.2.2 Frontera har överlåtit tvisteföremålet till Banken och har därför ingen partsställning i skiljeförfarandet*

33. SOCAR har i skiljeförfarandet genomgående hänvisat till det förhållandet att Frontera genom överlåtelsen av alla rättigheter till Banken har uttrått ur partstörhållandet och att Frontera därför inte kan anses äga talerätt i saken.

34. En utförligare sammanfattning av vad Frontera anfört i skiljeförfarandet i denna fråga bifogas som bilaga 3.

*2.2.3  SOCARs motfordran*

35. SOCAR har i skiljeförfarandet, för det fall skiljemännen inte skulle finna att Krav A och Krav B blivit föremål för rättskraftig och slutgiltig reglering genom Juli 2002-avtalet yrkat att de fordringar som SOCAR avskrev genom denna förlikning skulle upptagas som ett *"counterclaim"*, och därmed avräknas mot Fronteras krav. Skiljemännen har underlåtit att uppta SOCARs motfordran till prövning.

36. Skiljemännens skäl för att inte uppta SOCARs motfordran till prövning var enligt domskälen följande (skiljedomen, engelsk version, s. 54):

> *SOCAR submits its counterclaim only in case the Tribunal concludes that the July2002 Protocol is not a valid agreement. The Tribunal holds that this Protocol is valid. Consequently, the counterclaim fails.*
>
> *SOCAR gör sin motfordran gällande endast för det fall skiljemännen finner att Juli 2002-protokollet inte är ett giltigt avtal. Skiljemännen finner att detta protokoll är giltigt. Följaktligen förfaller motfordringen.*

---

[1] Eng: *In our submission, Frontera are not entitled to bring proceedings in respect of Claims A and B because both claims were resolved by the 4th July 2002 Protocol.*

37. Av SOCARs talan inför skiljemännen framgår med all tydlighet, att SOCAR hävdat att Juli 2002-avtalet rättskraftigt och fullständigt reglerat såväl SOCARs då kvarvarande anspråk som Fronteras anspråk uttryckta i Krav A och Krav B. Det har vidare varit uppenbart, att SOCAR med sina påståenden rörande Juli 2002-avtalet gjort gällande att detsamma omfattat en slutlig och rättskraftig reglering av parternas alla anspråk mot varandra. SOCAR har sålunda med termen *"valid agreement"* hävdat att avtalet var i dess helhet gällande, rättskraftigt och verksamt på Fronteras båda krav.

38. Enligt SOCARs uppfattning borde det inte av skiljemännen kunnat missförstås, att motkravet skulle tas upp till prövning om inte Juli 2002-avtalet utgjorde tillräcklig grund för att ogilla Fronteras båda nu aktuella anspråk.

39. Det sagda innebär att skiljemännen avslutat förfarandet utan att pröva frågan om SOCARs motkrav.

### 2.2.4 Definitionen av "LMO-tvisten"

40. I en inlaga till skiljemännen efter huvudförhandlingen gjorde Frontera gällande att det skulle föreligga en skillnad mellan *"seized"* och *"delivered"* olja, dvs. att Krav B ej skulle ingått i förlikningen av LMO-tvisten i Juli 2002-avtalet. I Decemberprotokollet p. 5 nämns emellertid särskilt LMO och export i samma sammanhang som utförselstoppet. Vidare refererar juli 2002-protokollet såväl till LMO som till råolja. Enligt SOCARs uppfattning kan det omöjligen råda något tvivel om att Krav B är en del av LMO-tvisten.

41. SOCAR bereddes emellertid i skiljeförfarandet aldrig tillfälle att bemöta Fronteras påståenden i denna del.

### 3. Rättsliga förutsättningar

42. Enligt 34 § 1. lagen om skiljeförfarande skall en skiljedom efter klander helt eller delvis upphävas på talan av en part om den inte omfattas av ett giltigt skiljeavtal mellan parterna. Detsamma gäller enligt 34 § 2. om skiljemännen annars har överskridit sitt uppdrag.

43. Punkt 1 är tillämplig om parterna inte alls har träffat något giltigt skiljeavtal. Den situationen är inte aktuell i detta mål. Punkt 1 är också tillämplig om skiljemännen har prövat en fråga som faller utanför ett i och för sig giltigt skiljeavtal. Gränsdragningen mot fall av uppdragsöverskridande (punkt 2) kan vara osäker men har ansetts sakna praktisk betydelse. Slutligen aktualiseras en tillämpning av bestämmelsen när en part påstår att ett i och för sig ingånget skiljeavtal inte längre gäller mellan parterna. Det kan vara fråga om såväl en ursprunglig ogiltighet som ett påstående om att avtalet sedermera har blivit ogiltigt eller av annan anledning har upphört att gälla. En part kan t.ex. göra gällande att avtalet är oskäligt enligt 36 § avtalslagen.[1]

44. Frågan om huruvida tvisten omfattas av ett giltigt skiljeavtal skall prövas med beaktande av 3 § lagen om skiljeförfarande och den s.k. separabilitetsdoktrinen.[2] När giltigheten av ett skiljeavtal som utgör en del av ett annat avtal skall bedömas vid prövningen av skiljemännens behörighet, är skiljeavtalet till följd härav att betrakta som ett särskilt avtal. Ofta anser den förlorande parten att hela kontraktet är ogiltigt eller hävt. Enligt separabilitetsdoktrinen utgör detta i sig inte grund för att skiljeavtalet skall bli ogiltigt. Endast om en ogiltighetsgrund specifikt tar sikte på skiljeklausulen kommer denna att sakna verkan.

---

[1] Prop. 1998/99:35 s. 235.
[2] Jfr Heuman, Skiljemannarätt s. 62 ff.

45. Vidare torde generellt gälla, att den sorts skiljeklausul som undantagslöst avser alla tvister i anledning av ett kontrakt, täcker även tvister som rör en ingången förliknings giltighet och tolkning. Detta följer av att sådana tvister har samband med det ursprungliga kontraktet. Om parterna träffat en uppgörelse i godo innebär förlikningen i typfallet att de materiella tvistefrågorna bilagts, men inte automatiskt att skiljeavtalet bringats att upphöra.[1] Annorlunda förhåller det sig om själva skiljeavtalet – som i förevarande fall – innehåller ett villkor av innebörd att ett skiljeförfarande kan äga rum endast för tvist som blivit föremål för ett försök att lösa tvisten i godo och/eller för tvist som inte har kunnat lösas genom frivillig uppgörelse. Skiljeavtalet omfattar då enbart tvister som faller utanför dessa kategorier. Om skiljeavtalet har en sådan utformning kan en tvist som förlikts eller lämnats utan förlikningsförhandling inte läggas till grund för en skiljedom.[2]

46. Har skiljemännen prövat en tvist som faller utanför ett i och för sig giltigt skiljeavtal skall hovrätten upphäva densamma.[3]

47. I förevarande fall råder ingen oklarhet om att parterna ursprungligen ingått ett giltigt skiljeavtal. Däremot gör SOCAR gällande att skiljedomen med avseende på den ifrågavarande tvisten (Krav B) inte omfattas av skiljeavtalet eftersom denna tvist blivit föremål för frivillig uppgörelse och därmed är uttryckligen undantagen från skiljeavtalets räckvidd.

48. Vidare gör SOCAR gällande att Frontera genom att till Banken överlåta samtliga sina rättigheter enligt PSA även överlåtit de rättigheter som följer av skiljeavtalet.

---

[1] Heuman s. 137.
[2] Jfr ibid. s. 154.
[3] Det sagda innebär inte att domen skall upphävas enbart i fall då skiljemännen varit obehöriga att uppta tvisten till prövning. I hithörande slags fall med s.k. dubbelverkande rättsfakta kan det ibland vara vanskligt att redan vid den inledande behörighetsprövningen avgöra om ett avtal är giltigt eller inte. För att skiljemännen skall anses behöriga att uppta tvisten till prövning räcker det emellertid att käranden påstår att ett giltigt avtal föreligger och att detta påstående inte är uppenbart ogrundat (Pålsson i SvJT 1999 s. 315 och NJA 2005 s. 586). Ett beslut härom är emellertid inte bindande (2 § andra stycket lagen om skiljeförfarande). Om käranden inte kan styrka avtalets giltighet med avseende på tvisteföremålet kan hans talan inte bifallas och en i detta avseende sakligt felaktig skiljedom skall efter klandertalan upphävas av domstolen.

49. Enligt gällande principer för fördelning av rättegångskostnader, har vinnande part rätt till ersättning för sina kostnader för skiljeförfarandet. SOCAR, som tillerkänts ersättning för en tredjedel av sina kostnader, är i allt väsentligt vinnande part, och borde rätteligen ha tillerkänts ersättning för merparten av sina kostnader.

## 4. Grunder för klandertalan

50. SOCAR, som också under skiljeförfarandet uttryckligen och/eller implicit framfört motsvarande invändningar och påståenden, preciserar härigenom grunderna för sin klandertalan enligt följande.

*4.1 Tvisten är förlikt och skiljedomen omfattas därför inte av det ingångna skiljeavtalet*

51. Enligt det mellan SOCAR och Frontera ursprungligen gällande skiljeavtalet får ett skiljeförfarande för prövning av en uppkommen tvist äga rum enbart under förutsättning *dels* att parterna först gjort ett försök att lösa tvisten på frivillig väg, *dels* att någon frivillig lösning inte uppnåtts.

52. Den tvist som enligt den klandrade skiljedomen avgjorts genom att SOCAR ålagts en betalningsförpliktelse har genom förlikningsavtal enligt Juli 2002-protokollet lösts på frivillig väg. Skiljeavtalet gäller inte för sådan tvist. Domen omfattas därför inte av ett giltigt skiljeavtal mellan parterna.

53. För det fall hovrätten, mot SOCARs uppfattning, skulle finna att tvisten inte lösts enligt Juli 2002-protokollet, gör SOCAR gällande att densamma inte heller omfattats av förlikningsförhandlingar som skiljeavtalet föreskriver. Domen omfattas därför inte av ett giltigt skiljeavtal mellan parterna.

54. För det fall hovrätten, mot SOCARS uppfattning, skulle finna att tvisten blivit föremål för sådana förhandlingar som föreskrivs i skiljeavtalet och trots det inte omfattas av förlikningsavtalet, hävdar SOCAR att Fronteras anspråk ligger helt utanför kontraktsförhållandet mellan parterna och sålunda inte omfattas av ett giltigt skiljeavtal mellan parterna.

55. För det fall hovrätten skulle finna att domen omfattas av ett giltigt skiljeavtal mellan parterna gör SOCAR gällande att skiljemännen på motsvarande grunder (punkt 49 – 52 ovan) genom sitt bifall till Fronteras anspråk i vart fall har överskridit sitt uppdrag.

56. Skiljedomen skall på nu anförda grunder upphävas (34 § 1 och 2 punkten lagen om skiljeförfarande).

*4.2 Frontera har överlåtit tvisteföremålet till Banken och har därför ingen partsställning i skiljeförfarandet*

57. För det fall hovrätten inte skulle finna grund i själva skiljeavtalet att upphäva domen gör SOCAR gällande att Frontera genom sin överlåtelse av alla rättigheter till Banken i alla händelser har frånhänt sig sin partsställning i förhållande till SOCAR och därför inte varit behörigt att påkalla skiljeförfarande. Skiljemännen har därför inte varit behöriga att pröva tvisten. Skiljedomen skall även på denna grund upphävas (34 § 1. och 2. lagen om skiljeförfarande).

*4.3 Fel i handläggningen*

58. Frontera har först i inlaga efter huvudförhandlingen (*Post Hearing Brief Submisson den 16 maj 2005)* åberopat omständigheter om *"seized"* olja

som något annat än "*delivered*" olja samt gjort gällande att Krav B till
följd därav inte omfattades av förlikningen av LMO-tvisten i Juli 2002-
avtalet.

59. Inte någon gång under förfarandet före eller under huvudförhandlingen har
Frontera väckt frågan om att LMO-tvisten skulle ha exkluderat Krav B.

60. Påståendet är grundlöst och felaktigt. Juli 2002-protokollet har – även med
uttrycklig hänvisning till *Crude oil* – omfattat den olja som skulle
levereras enligt December 2000-protokollet och SOCAR kan bevisa att
Juli 2002-avtalet omfattat Krav B.

61. SOCAR har inte beretts tillfälle att ens yttra sig över, än mindre föra
bevisning mot de nya omständigheter Frontera sålunda i sin sista inlaga
gjort gällande.

62. Genom att Frontera i skrift efter förhandlingen tillåtits åberopa nya
omständigheter i nu berört avseende utan tillfälle till genmäle för SOCAR,
har SOCAR också berövats varje möjlighet att bevisa det förhållandet att
påståendet var grundlöst. Frontera, som inte var part i förhandlingarna
inför Juli 2002-avtalet hade ingen möjlighet att styrka sitt påstående med
någon bevisning. Däremot skulle SOCAR ha kunnat bevisa att påståendet
var felaktigt. För alla som deltog i förhandlingarna var det otvetydigt att
LMO-tvisten avsåg den uppkomna konflikten i dess helhet utan något som
helst undantag av det slag som Frontera genom en semantisk
efterhandskonstruktion gjort gällande.

63. Det förhållandet att skiljemännen trots det nu anförda och utan iakttagande
av grundläggande kontradiktoriska principer har lagt Fronteras påstående
till grund för prövningen innebär att det i handläggningen utan SOCARs

vållande förekommit ett fel som inverkat på utgången. Skiljedomen skall även på denna grund upphävas (34 § 6. lagen om skiljeförfarande).

*4.4 Skiljemännen har lämnat SOCARs motfordran utan prövning*

64. SOCAR har, för det fall inte alla per den 4 juli 2002 utestående anspråk skulle anses slutligt reglerade genom Juli 2002-avtalet, gjort gällande en motfordran hos Frontera om USD 11 199 771. SOCAR gör gällande, att skiljemännen inte haft grund att lämna detta anspråk utan sakprövning.

65. SOCAR har visat fog för sitt anspråk.

66. Skiljedomen skall på nu anförda grunder ändras på sätt som innebär att SOCARs fordran avräknas från Fronteras krav, att Fronteras yrkande därför lämnas utan bifall samt att Frontera förpliktas betala överskjutande del av SOCARs fordran jämte SOCARs kostnader och hela kostnaden för skiljeförfarandet (36 § lagen om skiljeförfarande).

**6. Hovrättens föreläggande 2006-03-15**

67. Hovrättens föreläggande, aktbilaga 4, föranleder följande kommentarer.

68. Hela det utdömda beloppet åsyftas.

69. Frontera har i ett sent skede av förfarandet gjort gällande att termen "LMO-tvisten" i Deed of Release skulle avse endast Krav A. Först i en inlaga efter huvudförhandlingen hävdade Frontera att det skulle föreligga en skillnad mellan "*seized*" och "*delivered*" olja, dvs. att Krav B ej skulle ingått i förlikningen av LMO-tvisten i Juli 2002-avtalet.

70. Detta påstående, som fått avgörande betydelse för utgången,[1] har Frontera utvecklat först i *Post Hearing Brief Submisson den 16 maj 2005* efter huvudförhandlingen. SOCAR har inte beretts tillfälle att yttra sig häröver.

71. Ändringsyrkandet enligt 36 § lagen om skiljeförfarande grundas på det förhållandet att SOCARs motfordran inte upptagits till prövning (punkterna 35-39 och 64-66 i denna inlaga).

## 5. Bevisning

72. SOCAR önskar inkomma med uppgift om bevisning i hovrätten sedan kommande svaromål klarlagt i vad mån åberopade sakförhållanden är tvistiga i målet.

Stockholm den 12 april 2006

Staffan Michelson

---

[1] Se skiljedomen under rubriken *5.2.4 Faller en betydande del av Fronteras fordringar utanför uttrycket LMO-tvisten?*

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK       )
                            :   ss.:
COUNTY OF NEW YORK   )

Ruth Seitz, being duly sworn, says:

I am a resident of the State of New Jersey, over the age of eighteen years, and not a party to the within action.  My business address is PATTERSON, BELKNAP, WEBB & TYLER LLP, 1133 Avenue of the Americas, New York, NY 10036-6710.  On April 25, 2006, I served the within documents:

NOTICE OF MOTION, DECLARATION OF JOHN D. WINTER, DECLARATION OF ROVNAG ABDULLAYEV

☐   I sent such document from facsimile machine (212) 336-2222 on April 25, 2006.  I certify that said transmission was completed and that all pages were received and that a report was generated by facsimile machine (212) 336-2222 which confirms said transmission and receipt.  I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in a mail depository maintained by the United States Postal Service at 1133 Avenue of the Americas, New York, NY 10036, addressed as set forth below.

☐   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

James Berger, Esq.
PAUL HASTINGS JANOFSKY & WALKER, LLP
Park Avenue Tower, 75 East 55th St.
New York, NY 10022

Ruth Seitz

Sworn to before me this
25th day of April, 2006

Notary Public

MATTHEW M. FINNEGAN
Notary Public, State of New York
No. 01FI5080222
Qualified in New York County
Commission Expires June 16, 2007